**CORRECTED OPINION**

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

In Re: NVR, LP,
Debtor.

NVR HOMES, INCORPORATED,
Plaintiff-Appellee,

v.

CLERKS OF THE CIRCUIT COURTS FOR
ANNE ARUNDEL COUNTY, MARYLAND;
CLERKS OF THE CIRCUIT COURTS FOR
BALTIMORE, MARYLAND;
CLERKS OF THE CIRCUIT COURTS FOR
CARROLL COUNTY, MARYLAND;
CLERKS OF THE CIRCUIT COURTS FOR

FREDERICK COUNTY, MARYLAND;
CLERKS OF THE CIRCUIT COURTS FOR
HARFORD COUNTY, MARYLAND;
CLERKS OF THE CIRCUIT COURTS FOR
HOWARD COUNTY, MARYLAND;
CLERKS OF THE CIRCUIT COURTS FOR
MONTGOMERY COUNTY, MARYLAND;
CLERKS OF THE CIRCUIT COURTS FOR
PRINCE GEORGE'S COUNTY,
MARYLAND; CLERKS OF THE CIRCUIT
COURTS FOR WASHINGTON COUNTY,
MARYLAND,
Defendants-Appellants,

and

No. 98-2211

FRANKLIN PARK BOROUGH; HAMPTON
TOWNSHIP; HAMPTON TOWNSHIP
SCHOOL DISTRICT; SENECA VALLEY
SCHOOL DISTRICT; MOON AREA
SCHOOL DISTRICT; MOON TOWNSHIP;
NORTH ALLEGHENY SCHOOL DISTRICT;
SHALER AREA SCHOOL DISTRICT;
COMMONWEALTH OF PENNSYLVANIA,
Defendants.

In Re: NVR, LP,
Debtor.

NVR HOMES, INCORPORATED,
Plaintiff-Appellee,

v.

COMMONWEALTH OF PENNSYLVANIA,
Defendant-Appellant,

and

FRANKLIN PARK BOROUGH; HAMPTON
TOWNSHIP; HAMPTON TOWNSHIP
SCHOOL DISTRICT; CLERKS OF THE
CIRCUIT COURTS FOR ANNE ARUNDEL
COUNTY, MARYLAND; CLERKS OF THE
CIRCUIT COURTS FOR BALTIMORE,
MARYLAND; CLERKS OF THE CIRCUIT
COURTS FOR CARROLL COUNTY,
MARYLAND; CLERKS OF THE CIRCUIT
COURTS FOR FREDERICK COUNTY,
MARYLAND; CLERKS OF THE CIRCUIT
COURTS FOR HARFORD COUNTY,

No. 98-2244

2

MARYLAND; CLERKS OF THE CIRCUIT
COURTS FOR HOWARD COUNTY,
MARYLAND; CLERKS OF THE CIRCUIT
COURTS FOR MONTGOMERY COUNTY,
MARYLAND; CLERKS OF THE CIRCUIT
COURTS FOR PRINCE GEORGE'S
COUNTY, MARYLAND; CLERKS OF THE
CIRCUIT COURTS FOR WASHINGTON
COUNTY, MARYLAND; SENECA VALLEY
SCHOOL DISTRICT; MOON AREA
SCHOOL DISTRICT; MOON TOWNSHIP;
NORTH ALLEGHENY SCHOOL DISTRICT;
SHALER AREA SCHOOL DISTRICT,
Defendants.

In Re: NVR, LP,
Debtor.

NVR HOMES, INCORPORATED,
Plaintiff-Appellee,

v.

SENECA VALLEY SCHOOL DISTRICT;
SHALER AREA SCHOOL DISTRICT,

No. 98-2271

Defendants-Appellants,

and

FRANKLIN PARK BOROUGH; HAMPTON
TOWNSHIP; HAMPTON TOWNSHIP
SCHOOL DISTRICT; CLERKS OF THE
CIRCUIT COURTS FOR ANNE ARUNDEL
COUNTY, MARYLAND; CLERKS OF THE
CIRCUIT COURTS FOR BALTIMORE,

3

MARYLAND; CLERKS OF THE CIRCUIT
COURTS FOR CARROLL COUNTY,
MARYLAND; CLERKS OF THE CIRCUIT
COURTS FOR FREDERICK COUNTY,
MARYLAND; CLERKS OF THE CIRCUIT
COURTS FOR HARFORD COUNTY,
MARYLAND; CLERKS OF THE CIRCUIT
COURTS FOR HOWARD COUNTY,
MARYLAND; CLERKS OF THE CIRCUIT
COURTS FOR MONTGOMERY COUNTY,
MARYLAND; CLERKS OF THE CIRCUIT
COURTS FOR PRINCE GEORGE'S
COUNTY, MARYLAND; CLERKS OF THE
CIRCUIT COURTS FOR WASHINGTON
COUNTY, MARYLAND; COMMONWEALTH
OF PENNSYLVANIA,
Defendants.

In Re: NVR, LP,
Debtor.

NVR HOMES, INCORPORATED,
Plaintiff-Appellee,

v.

FRANKLIN PARK BOROUGH; HAMPTON
TOWNSHIP; HAMPTON TOWNSHIP
SCHOOL DISTRICT,
Defendants-Appellants,

and

CLERKS OF THE CIRCUIT COURTS FOR
ANNE ARUNDEL COUNTY, MARYLAND;

No. 98-2272

4

CLERKS OF THE CIRCUIT COURTS FOR
BALTIMORE, MARYLAND; CLERKS OF
THE CIRCUIT COURTS FOR CARROLL
COUNTY, MARYLAND; CLERKS OF THE
CIRCUIT COURTS FOR FREDERICK
COUNTY, MARYLAND; CLERKS OF THE
CIRCUIT COURTS FOR HARFORD
COUNTY, MARYLAND; CLERKS OF THE
CIRCUIT COURTS FOR HOWARD
COUNTY, MARYLAND; CLERKS OF THE
CIRCUIT COURTS FOR MONTGOMERY
COUNTY, MARYLAND; CLERKS OF THE
CIRCUIT COURTS FOR PRINCE
GEORGE'S COUNTY, MARYLAND;
CLERKS OF THE CIRCUIT COURTS FOR
WASHINGTON COUNTY, MARYLAND;
SENECA VALLEY SCHOOL DISTRICT;
MOON AREA SCHOOL DISTRICT; MOON
TOWNSHIP; NORTH ALLEGHENY
SCHOOL DISTRICT; SHALER AREA
SCHOOL DISTRICT; COMMONWEALTH OF
PENNSYLVANIA,
Defendants.

In Re: NVR, LP,
Debtor.

No. 98-2273

NVR HOMES, INCORPORATED,
Plaintiff-Appellee,

v.

MOON AREA SCHOOL DISTRICT; MOON
TOWNSHIP; NORTH ALLEGHENY
SCHOOL DISTRICT,
Defendants-Appellants,

and

FRANKLIN PARK BOROUGH; HAMPTON
TOWNSHIP; HAMPTON TOWNSHIP
SCHOOL DISTRICT; CLERKS OF THE
CIRCUIT COURTS FOR ANNE ARUNDEL
COUNTY, MARYLAND; CLERKS OF THE
CIRCUIT COURTS FOR BALTIMORE,
MARYLAND; CLERKS OF THE CIRCUIT
COURTS FOR CARROLL COUNTY,
MARYLAND; CLERKS OF THE CIRCUIT
COURTS FOR FREDERICK COUNTY,
MARYLAND; CLERKS OF THE CIRCUIT
COURTS FOR HARFORD COUNTY,
MARYLAND; CLERKS OF THE CIRCUIT
COURTS FOR HOWARD COUNTY,
MARYLAND; CLERKS OF THE CIRCUIT
COURTS FOR MONTGOMERY COUNTY,
MARYLAND; CLERKS OF THE CIRCUIT
COURTS FOR PRINCE GEORGE'S
COUNTY, MARYLAND; CLERKS OF THE
CIRCUIT COURTS FOR WASHINGTON
COUNTY, MARYLAND; SENECA VALLEY
SCHOOL DISTRICT; SHALER AREA
SCHOOL DISTRICT; COMMONWEALTH OF
PENNSYLVANIA,
Defendants.

Appeals from the United States District Court
for the Eastern District of Virginia, at Alexandria.
T. S. Ellis, III, District Judge.
(CA-97-1238-A, BK-92-11704-DOT)

6

Argued: April 7, 1999

Decided: July 12, 1999

Corrected opinion filed: August 16, 1999

Before WILKINSON, Chief Judge, and HAMILTON and
WILLIAMS, Circuit Judges.

_____

Vacated in part, affirmed in part, and reversed in part by published
opinion. Judge Williams wrote the opinion, in which Judge Hamilton
joined. Chief Judge Wilkinson wrote an opinion concurring in part
and concurring in the judgment.

_____

## COUNSEL

**ARGUED:** Julia Melville Andrew, Assistant Attorney General, Balti-
more, Maryland, for Appellants. Arnold Murray Weiner, SNYDER,
WEINER, WELTCHEK, VOGELSTEIN & BROWN, Pikesville,
Maryland, for Appellee. **ON BRIEF:** J. Joseph Curran, Jr., Attorney
General of Maryland, Baltimore, Maryland; Robert D. Edmundson,
Senior Deputy Attorney General, Pittsburgh, Pennsylvania, for Appel-
lants. James M. Sack, SACK & ASSOCIATES, McLean, Virginia;
Allan P. Hillman, Nathan D. Adler, NEUBERGER, QUINN,
GIELEN, RUBIN & GIBBER, P.A., Baltimore, Maryland, for Appel-
lee.

_____

## OPINION

WILLIAMS, Circuit Judge:

On October 23, 1995, NVR Homes, Inc. (NVR), a former debtor
in bankruptcy, filed a motion in accordance with Federal Rule of
Bankruptcy Procedure 9014, seeking a declaration that 11 U.S.C.A.
§ 1146(c) (West 1993) exempted it from certain transfer and recorda-

tion taxes that it had paid in connection with the transfer of real property during the bankruptcy period. The state and local taxing authorities who had received and refused or failed to refund the recordation and transfer tax proceeds were located in Pennsylvania and Maryland. Pursuant to Rule 9014, each of the taxing authorities was served with notice of the motion and each responded by filing motions for abstention, dismissal, or summary judgment. On March 25, 1996, the bankruptcy court granted NVR's motion and held that under § 1146(c), NVR was exempt from transfer and recordation taxes on any real property transfers completed between April 6, 1992, the date that NVR filed a bankruptcy petition, and September 30, 1993, the date that its reorganization plan was fully implemented and the bankruptcy period ended.

Thereafter, the state taxing authorities[1] filed motions requesting the bankruptcy court reconsider its order in light of the Supreme Court's interpretation of Eleventh Amendment immunity in Seminole Tribe v. Florida, 116 S. Ct. 1114 (1996). On March 28, 1997, the bankruptcy court issued an order amending its judgment dated March 25, 1996, specifically holding that "§ 106 of the Bankruptcy Code is unconstitutional and that the Eleventh Amendment precludes[the bankruptcy court's previous order] from binding the Commonwealth of Pennsylvania and the Maryland circuit court clerks [the state taxing authorities] as collectors of a state transfer tax." (J.A. at 335.)

On appeal, the district court affirmed the bankruptcy court's judgment that NVR was exempt from transfer and recordation taxes under § 1146(c). The district court reversed the bankruptcy court's decision that the Eleventh Amendment immunized the state taxing authorities, reasoning that the Rule 9014 motion was not a "suit" for Eleventh Amendment purposes. The district court refused, however, to determine whether the declaratory judgment would be binding upon the state taxing authorities. For the following reasons, we vacate in part, affirm in part, and reverse in part.

---

[1] We consider the state taxing authorities to be: the clerks of the circuit courts for Anne Arundel, Baltimore, Carroll, Harford, Howard, Frederick, Montgomery, Prince George's, and Washington Counties to the extent they serve as the collectors of Maryland state taxes; and the Department of Revenue for the Commonwealth of Pennsylvania.

I.

The facts of this appeal are largely undisputed and have been thoroughly recited by the lower courts. See Clerk of the Circuit Court v. NVR Homes, Inc., 222 B.R. 514 (E.D. Va. 1998); In re NVR L.P., 206 B.R. 831 (Bankr. E.D. Va. 1997). We will only briefly address them here.

During the 1980s, NVR was a leading homebuilder whose primary operations were located in the states of Virginia and Maryland. In a move to expand its operations in 1987, NVR acquired Ryan Homes, a major homebuilder, and financed the acquisition with over $450,000,000 in debt. The financing was provided by a consortium of banks and the issuance of subordinated debt securities. A short time later, NVR began experiencing declining operating margins and had difficulty in meeting its substantial debt service commitments. Its financial difficulties did not abate, and on April 6, 1992, NVR sought protection under Chapter 11 of the Bankruptcy Code.

The bankruptcy court allowed NVR to continue its business operations essentially uninterrupted while it pursued the development and confirmation of a reorganization plan. From April 6, 1992, the petition date, until September 30, 1993, the date NVR eventually emerged from bankruptcy, NVR made 5,571 transfers of real property and paid $8,349,103 in transfer and recordation taxes to state and local taxing authorities. NVR paid just under $7,000,000 of this amount to taxing authorities in Pennsylvania and Maryland.

On July 22, 1993, the bankruptcy court confirmed NVR's plan of reorganization (the Plan), which satisfied the outstanding bank consortium debt with funds from a new debt offering and basically transformed the former subordinated debt holders into equity holders. One section of the Plan, section 4.13, dealt specifically with the issue before us and reads:

> Pursuant to section 1146(c) of the Bankruptcy Code, the issuance, transfer, or exchange of securities pursuant to the Plan, and the transfer of, or creation of any lien on, any property of any Debtor under, in furtherance of, or in con-

9

> nection with the Plan shall not be subject to any stamp tax,
> real estate transfer tax, recordation tax, or similar tax.

(J.A. at 43.) This section essentially invoked the exemptions already allowed to debtors by 11 U.S.C.A. § 1146(c) (West 1993). Section 1146(c) provides that "[t]he issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer under a plan confirmed . . ., may not be taxed under any law imposing a stamp tax or similar tax." 11 U.S.C.A. § 1146(c).

The Plan was quickly implemented and NVR emerged from bankruptcy on September 30, 1993. NVR then began pursuing refunds of the recordation and transfer taxes paid during the bankruptcy period. All of the taxing jurisdictions in the states of Delaware, New York, North Carolina, and Virginia refunded the taxes without protest. Maryland, Pennsylvania, and the taxing authorities therein, however, refused to remit the requested refunds.

To obtain an interpretation of whether the tax payments were exempted under the Bankruptcy Code and the Plan, NVR initiated a Rule 9014 motion under the Federal Rules of Bankruptcy Procedure. The bankruptcy court, and the district court on appeal, determined that section 4.13 of the Plan, pursuant to 11 U.S.C.A. § 1146(c), exempted NVR from paying transfer and recordation taxes during the entire bankruptcy period. The bankruptcy court held, however, that the state taxing authorities were not bound by the determination because of their Eleventh Amendment immunity to suits in federal court. On appeal, the district court reversed that holding and decided that the Eleventh Amendment did not confer immunity upon the state taxing authorities because the Rule 9014 motion was not a "suit" under the Eleventh Amendment.

Two issues are presented to this Court on appeal: first, whether the Eleventh Amendment bars the action in regard to the state taxing authorities; and second, whether § 1146(c) exempts debtors in reorganization from paying transfer and recordation taxes throughout the bankruptcy period.

II.

"We review the judgment of a district court sitting in review of a bankruptcy court de novo, applying the same standards of review that

10

were applied in the district court." Three Sisters Partners, L.L.C. v. Harden (In re Shangra-La, Inc.), 167 F.3d 843, 847 (4th Cir. 1999). Specifically, "[w]e review the bankruptcy court's factual findings for clear error, while we review questions of law de novo." Loudoun Leasing Dev. Co. v. Ford Motor Credit Co. (In re K&L Lakeland, Inc.), 128 F.3d 203, 206 (4th Cir. 1997). Because each of the questions present a purely legal issue, our review is de novo.

A.

Since the Supreme Court issued Seminole Tribe v. Florida, 116 S. Ct. 1114 (1996), states have hotly contested the extent of their Eleventh Amendment immunity in federal bankruptcy proceedings. During the past three years, this Court alone has published three opinions clarifying the issue. See Virginia v. Collins (In re Collins), 1999 WL 183800 (4th Cir. Apr. 5, 1999); Maryland v. Antonelli Creditors' Liquidating Trust, 123 F.3d 777 (4th Cir. 1997); Schlossberg v. Maryland (In re Creative Goldsmiths), 119 F.3d 1140 (4th Cir. 1997), cert. denied, 118 S. Ct. 1517 (1998). In the case now before us, two states, Maryland and Pennsylvania, again claim Eleventh Amendment immunity from federal jurisdiction in a bankruptcy proceeding. They argue that the lower courts' decisions holding certain transfers exempt from state taxes under 11 U.S.C.A. § 1146(c) (West 1993) can be viewed in only one of two ways: either the ruling was advisory and thus constitutionally impermissible, or the proceeding itself amounted to a "suit" from which Maryland and Pennsylvania were immune under the Eleventh Amendment. If the Eleventh Amendment does grant the states immunity, then the federal courts are deprived of jurisdiction over claims against the states. See Edelman v. Jordan, 415 U.S. 651, 678 (1974). The protracted history of the Eleventh Amendment supports Maryland's and Pennsylvania's claims of immunity, and, therefore, we are bound to vacate the action to the extent it applies to the states.

1.

Beginning with the Constitution's ratification, the American populace expressed concern that the new union would unduly subordinate the sovereignty of the states through the exercise of federal judicial power. Proponents of the Constitution, including Alexander Hamilton

11

and James Madison, ably met these attacks and dismissed the criticisms as completely foreign to any previous or contemporary understanding of sovereign immunity. See Hans v. Louisiana, 134 U.S. 1, 12-14 (1890) (discussing the Founders' belief that a state would not be subject to the power of the federal courts absent express consent); Edelman, 415 U.S. at 662 n.9 (providing a summary of historical statements concerning the sovereign immunity of the states); The Federalist No. 81, at 487-88 (Alexander Hamilton) (Clinton Rossiter ed., 1961). Unfortunately, concerns about state sovereignty proved more legitimate than the Founders believed.

In Chisholm v. Georgia, 2 U.S. (2 Dall.) 419 (1793), the Supreme Court held that a state could be subjected to the jurisdiction of federal courts in suits filed by citizens of another state. In response, a shocked nation soon remedied the unpalatable decision by ratifying the Eleventh Amendment, effectively reversing Chisholm . See Hans, 134 U.S. at 11. The Eleventh Amendment states that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. Determined not again to mistake the ratifying public's original intent, the Supreme Court held in Hans v. Louisiana that a state's sovereign immunity also extended to suits filed by one of its own citizens. See Hans, 134 U.S. at 20-21; see also Seminole Tribe, 116 S. Ct. at 1130.

Over 100 years later, the Supreme Court re-emphasized the import of the Eleventh Amendment and the significant restrictions it enforces against federal court jurisdiction. In Seminole Tribe, the Court made clear that Congress had no authority under its Article I grant of power to abrogate the sovereign immunity of the states. See Seminole Tribe 116 S. Ct. at 1131-32. The Supreme Court recognized that the subsequently ratified Fourteenth Amendment fundamentally altered the federal-state balance of power and, accordingly, gave Congress license to abrogate the sovereign immunity of the states in order to enforce the guarantees of the Fourteenth Amendment. See id. at 1125. The primary question under the Eleventh Amendment thus became whether Congress had the power to abrogate a state's sovereign immunity -- i.e., whether it acted pursuant to its enforcement power under the Fourteenth Amendment.

12

2.

In Schlossberg v. Maryland (In re Creative Goldsmiths), 119 F.3d 1140 (4th Cir. 1997), cert. denied, 118 S. Ct. 1517 (1998), this Court applied the analysis mandated by Seminole Tribe to the Bankruptcy Code's express abrogation of state sovereign immunity. See 11 U.S.C.A. § 106 (West Supp. 1999).[2] Finding that Congress enacted the Bankruptcy Code's abrogation provision pursuant to its power under the Bankruptcy Clause, see U.S. Const., art. I, § 8, cl. 4, rather than its authority under the Fourteenth Amendment, we concluded that Bankruptcy Code's express abrogation of state sovereign immunity was beyond Congress's authority, see Schlossberg, 119 F.3d at 1145-47.

This holding did not end the matter, however, because the Eleventh Amendment does not reach every variety of judicial proceeding. Before the Eleventh Amendment applies, the federal judicial action must fairly be deemed a "suit." The Supreme Court roughly outlined the contours of a "suit" for purposes of the Eleventh Amendment in an early opinion authored by Chief Justice Marshall:

> What is a suit? We understand it to be the prosecution, or pursuit, of some claim, demand, or request. In law language, it is the prosecution of some demand in a court of justice. The remedy for every species of wrong is, says Judge Blackstone, the being put in possession of that right whereof the party injured is deprived. The instruments whereby this remedy is obtained, are a diversity of suits and actions, which are defined by the Mirror to be the lawful demand of one's right. . . . Blackstone then proceeds to describe every species of remedy by suit; and they are all cases where the party suing claims to obtain something to which he has a right.

_____

[2] Section 106(a) reads as follows:"Notwithstanding an assertion of sovereign immunity, sovereign immunity is abrogated as to a governmental unit to the extent set forth in this section with respect to the following . . . [listing Bankruptcy Code sections]." 11 U.S.C.A. § 106(a) (West Supp. 1999).

Cohens v. Virginia, 19 U.S. (6 Wheat.) 264, 407-08 (1821) (internal quotation marks omitted). Later, the Supreme Court observed that suits could be defined by looking to "the essential nature and effect of the proceeding." Ford Motor Co. v. Department of Treasury, 323 U.S. 459, 464 (1945); see also In re New York , 256 U.S. 490, 500 (1921) (holding that a determination under the Eleventh Amendment requires "that the question is to be determined not by the mere names of the titular parties but by the essential nature and effect of the proceeding, as it appears from the entire record"). A thorough analysis of whether a judicial proceeding constitutes a suit must accordingly consider both the procedural posture and substantive nature of the proceeding. Moreover, if the substance of "the action is in essence one for the recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit." Ford Motor Co., 323 U.S. at 464.

In Schlossberg, 119 F.3d at 1140, Maryland v. Antonelli Creditor's Liquidating Trust, 123 F.3d 777 (4th Cir. 1997), and most recently in Virginia v. Collins, 1999 WL 183800 (4th Cir. Apr. 5, 1999), we distinguished the exercise of a federal court's jurisdiction to dispose of a debtor's estate from a suit against a state. In Schlossberg, a trustee brought an action against the State of Maryland to recover a state income tax payment that was alleged to be a preferential transfer. See Schlossberg, 119 F.3d at 1142. We held that an adversary proceeding initiated by the debtor's estate, seeking a return of property from the state, violated the Eleventh Amendment and was impermissible unless the state had waived its immunity.**3** See id. at 1147.

Antonelli presented a very different scenario. In that case, the State of Maryland brought suit in state court to recover unpaid transfer and recordation taxes from the Antonelli Creditor's Liquidating Trust (the Trust), a creation of the bankruptcy process. See Antonelli, 123 F.3d at 779. The Trust removed the case to federal court and defended on the ground that the state transfer and recordation taxes were exempt under § 1146(c) of the Bankruptcy Code pursuant to the original bankruptcy court disposition. See id. Maryland claimed that it was

_____

**3** On appeal, NVR does not contend that the states waived their sovereign immunity by agreeing to the bankruptcy court's jurisdiction, and, therefore, we have no occasion to address the issue.

14

immune not from the immediate proceeding, but from the effects of the original bankruptcy proceeding, which resulted in the order exempting the taxes. See id. at 781. We disagreed. Central to our holding was the fact that

> [t]he state was not named a defendant, nor was it served with process mandating that it appear in a federal court. While it was served with notice of the proposed plan and its confirmation, it was free to enter federal court voluntarily or to refrain from doing so. This is to be distinguished from the case in which a debtor, a trustee or other private person files an adversary action against the state in the bankruptcy court, causing the bankruptcy court to issue process summonsing the state to appear. Such an adversary proceeding would be a suit "prosecuted against one of the United States" and adjudication of that suit would depend on the court's jurisdiction over the state, implicating the Eleventh Amendment's limitation on federal judicial power.

Id. at 786-87. Because the federal court appropriately maintained jurisdiction over the debtor's estate and Maryland was free to decide whether to press its interests in the federal court, we concluded that the Eleventh Amendment did not immunize Maryland from the effects of a proceeding that merely confirmed a Chapter 11 reorganization plan.

In Collins, this Court's most recent decision applying the Eleventh Amendment to a bankruptcy proceeding, we held that the Eleventh Amendment did not bar a debtor's motion to reopen a bankruptcy case for a determination upon whether a debt to Virginia was dischargeable. See Collins, 1999 WL 183800 at *1. During the original bankruptcy proceeding, which disposed of the debtor's estate, Virginia in its role as a creditor was served with notice, but chose not to participate in the proceeding. See id. Four years later, Virginia pressed its claim against the debtors, leading to the proceeding's reopening and a determination that the debt to Virginia was discharged. See id. As we stated, the jurisdiction "over the dischargeability of debt, just like its jurisdiction to confirm a plan of reorganization, `derives not from jurisdiction over the state or other creditors, but rather from jurisdiction over debtors and their estates.'"

15

Id. at *5 (quoting Antonelli, 123 F.3d at 787). We held that the reopening to determine the status of the debt to Virginia was just a continuation of the original proceeding, and, therefore, not a suit against the state under the Eleventh Amendment. See id. at *6.

3.

From the above precedents, we are left to decide whether the case before us is a suit against the state taxing authorities or merely a proceeding to clarify a Chapter 11 plan of reorganization. As we must, we turn to an evaluation of the procedure and substance of NVR's Rule 9014 motion. As to the case's procedural posture, two issues are important: first, the degree of coercion exercised by the federal court in compelling the state to attend, see Antonelli , 123 F.3d at 786-87; and second, whether the resolution, or the remedy, would require our jurisdiction over the state, see id. The substantive consideration focuses upon whether the action was, as stated by Chief Justice Marshall, "the prosecution of some demand in a Court of justice," as opposed to the orderly disposition of an estate, with the states' role limited to that of any other creditor. Cohens , 19 U.S. (6 Wheat.) at 407; see Ford Motor Co., 323 U.S. at 464.

At first glance, it appears that this case mirrors Antonelli because both cases pose the issue of whether a debtor is entitled to an exemption from taxes under 11 U.S.C.A. § 1146(c) (West 1993). See Antonelli, 123 F.3d at 779. That, however, is where the substantive and procedural similarities end. In Antonelli , the federal courts were called upon merely to conclude whether a reorganization plan complied with federal law. See id. at 787. That interpretive process, by defining the rights and disposition of the estate, collaterally affects the rights of virtually every party related to the estate, including owners, creditors, and employees -- even if one happens to be a state. That process, however, generally does not force any party to participate. It in fact may be of some advantage to the remaining participants if a creditor chooses not to participate and consequently forfeits a claim. In Antonelli, Maryland claimed immunity from the legal interpretations emanating from the Chapter 11 proceeding when it later brought suit against the Trust operating pursuant to the reorganization plan. See id. at 786-87. The Eleventh Amendment, of course, does not free Maryland from federal law, but simply the jurisdiction of federal

16

courts. The Chapter 11 proceeding attempted neither to call Maryland into federal court nor to enforce a federal court order against it. Indeed, the only reason why the issue arose was because Maryland sued to recover funds from the Trust. See id. at 779.

The circumstances before us are easily distinguished and look a great deal more like those present in Schlossberg. As framed, both Schlossberg and the present case sought the payment of funds held by the state; in Schlossberg it was the avoidance of an alleged preferential transfer to the state, and here, it is the return of allegedly exempt tax payments made to the state. Furthermore, both situations require the bankruptcy court to maintain jurisdiction over the states. A full review of these crucial characteristics -- i.e., the coercion exercised against the states, whether the resolution required federal jurisdiction over the states, and the substance of the remedy sought -- leads us to conclude that this bankruptcy court proceeding was indeed a suit prosecuted against Maryland and Pennsylvania.

To begin with, this action was initiated as a motion under Rule 9014 of the Federal Rules of Bankruptcy Procedure. Rule 9014 is entitled "Contested Matters" and as commentators have noted, it is unlike an administrative matter in bankruptcy because "there are (at least) two parties who are opposing each other with respect to relief sought by one of them." 10 Collier on Bankruptcy ¶ 9014.01 (Lawrence P. King ed., 15th ed. 1999). The motion thus set NVR's interests at odds with the states'. We recognize, however, that the bankruptcy court did not issue a summons to either Maryland or Pennsylvania, although they were served with notice as mandated by Rule 9014. The coercion exercised by the bankruptcy court towards Maryland and Pennsylvania was thus no greater than in a proceeding to determine the disposition of a debtor's estate-- the state had notice of the proceeding and was free to join the action, but was not compelled to submit to federal court jurisdiction. As we have stated on other occasions, this position was not an enviable one for the states because they either had to enter federal court to defend their rights or to allow the court to proceed without the benefit of their arguments. See Collins, 1999 WL 183800 at *6. Nevertheless,"it does not amount to the exercise of federal judicial power to hale a state into federal court against its will and in violation of the Eleventh Amendment." Antonelli, 123 F.3d at 787. Accordingly, this characteristic of

17

the proceeding does not compel us to hold that the action was a suit against the states.

The ultimate resolution of the dispute between NVR and the states does require, however, that the federal courts exercise jurisdiction over the states. The states persuasively framed this issue by noting that if the federal court action could not result in ordering the states to return the tax payments, then any opinion issued would be advisory and improper. See Hewitt v. Helms, 482 U.S. 755, 761 (1987) ("The real value of the judicial pronouncement -- what makes it a proper judicial resolution of a `case or controversy' rather than an advisory opinion -- is in the settling of some dispute which affects the behavior of the defendant towards the plaintiff."). The district court attempted to tip-toe around the issue by stating,"Neither reached nor decided here is the question whether the bankruptcy court's [order declaring NVR exempt from the transfer and recordation taxes] is binding in any way on the [state] [t]axing [a]uthorities." Clerk of the Circuit Court v. NVR Homes, Inc., 222 B.R. 514, 521 (E.D. Va. 1998). It is apparent, however, that absent the ability of the bankruptcy court to exercise jurisdiction over the states and compel the turnover of the tax payments, no remedy effectively could be granted. This case is indeed one in which "adjudication . . . depend[s] on the court's jurisdiction over the state." Antonelli, 123 F.3d at 787. This finding alone is enough to determine that the action, if it is to meet the requirements of Article III, is a suit against the states.

Moreover, the substance of NVR's motion demands affirmative action by Maryland and Pennsylvania. See Cohens , 19 U.S. (6 Wheat) at 407-08; Texas v. Walker, 142 F.3d 813, 823 (5th Cir. 1998) (noting that adversary proceedings initiated against a state during the bankruptcy process, absent a waiver, would offend the Eleventh Amendment). NVR is demanding payment from the Maryland and Pennsylvania treasuries. Although federal law may reign supreme in the bankruptcy context, the federal courts do not necessarily reign supreme over an unconsenting state's treasury. See, e.g., Sacred Heart Hosp. v. Pennsylvania (In re Sacred Heart Hosp.), 133 F.3d 237, 243 (3d Cir. 1998) (citing Seminole Tribe, 517 U.S. at 71-74) ("Even when the Constitution vests in Congress complete law-making authority over a particular area, the Eleventh Amendment prevents congressional authorization of suits by private parties against unconsenting

18

States."). As courts have recognized in similar contexts, a state is closely identified with its treasury and an action leading to an order forcing a payment to citizens is the quintessential "suit" under the Eleventh Amendment. See Hess v. Port Authority Trans-Hudson Corp., 513 U.S. 30, 48-49 (1994) (noting the almost unanimous view that the primary factor in determining whether a state is immune from a federal judicial proceeding depends upon whether the action directly impacts the state treasury); Ford Motor Co., 323 U.S. at 464; Gray v. Laws, 51 F.3d 426, 433 (4th Cir. 1995) ("[I]t appears that a determination that the state treasury will be liable for a particular judgment is largely, if not wholly, dispositive of Eleventh Amendment immunity . . . ."); see also CSX Transp., Inc. v. Board of Public Works, 138 F.3d 537, 541 (4th Cir.) (distinguishing actions that have direct effects on a state treasury with those having only ancillary effects), cert. denied, 119 S. Ct. 63 (1998); cf. Hoffman v. Connecticut Dept. of Income Maintenance, 492 U.S. 96, 102 (1989) (holding that 11 U.S.C.A. § 106(c) (West 1993) does not allow federal courts to enter money judgments against the states).**4** The demand for money from a state is a strong indication that a federal judicial proceeding is indeed a suit against the state under the Eleventh Amendment.

In sum, despite the fact that neither Maryland nor Pennsylvania suffered the indignity of being summonsed to appear in a federal court, we determine that they are immune from the prosecution of NVR's Rule 9014 motion. The motion initiated a "contested matter" pitting Maryland and Pennsylvania against NVR, a citizen of their own state or of another state. The "suit" clearly sought a determination that the states owed NVR money -- repayment of exempt transfer and recordation taxes -- and a favorable decision would require that a federal court raid Maryland's and Pennsylvania's treasuries. Because NVR "commenced or prosecuted" a suit against the states, sovereign immunity applies, and the suit is barred as to the states.

_____

**4** Concurring in Hoffman v. Connecticut Dept. of Income Maintenance, 492 U.S. 96 (1989), Justice Scalia found it unnecessary to interpret § 106(c), and instead stated that "Congress lacks authority under the Bankruptcy Clause to abrogate the States' immunity from money-damages actions." United States v. Nordic Village, Inc., 503 U.S. 30, 33 (1992) (summarizing Justice Scalia's concurrence in Hoffman, 492 U.S. at 105).

19

The district court's holding that the states might not be bound by a federal interpretation of § 1146(c), secures no satisfaction for NVR, thus making a decision advisory and beyond a federal court's Article III power.[5] We think it best to avoid such judicial gerrymandering and, instead, concede that our constitutional power to enforce federal bankruptcy law, absent a waiver of immunity, does not allow for the forced extraction of payments from a sovereign state's treasury.

B.

Although our holding above moots the issue of a§ 1146(c) exemption as applied to the state taxing authorities, it does not bar the action in relation to the local taxing authorities. Local governments do not enjoy sovereign immunity under the Eleventh Amendment. See Monell v. Department of Social Servs., 436 U.S. 658, 690 n.54 (1978); Gray, 51 F.3d at 431.

The local taxing authorities argue that a proper interpretation of § 1146(c) does not provide tax exemptions for preconfirmation transfers taking place in the ordinary course of business. Both the bankruptcy court and the district court rejected that argument, however,

_____

[5] If, instead, our decision would act only as res judicata in a later state court or state administrative proceeding, then the issuance of the judgment would still be improper. The Supreme Court observed in a similar circumstance:

> We think that the award of a declaratory judgment in this situation would be useful in resolving the dispute over the past lawfulness of respondent's action only if it might be offered in state-court proceedings as res judicata on the issue of liability, leaving to the state courts only a form of accounting proceeding whereby damages or restitution would be computed. But the issuance of a declaratory judgment in these circumstances would have much the same effect as a full-fledged award of damages or restitution by the federal court, the latter kinds of relief being of course prohibited by the Eleventh Amendment.

Green v. Mansour, 474 U.S. 64, 73 (1985). The Court also noted that "if the federal judgment would not have such an effect, then it would serve no useful purpose as a final determination of rights." Id. (internal quotation marks omitted).

20

and held that § 1146(c) exempted NVR from paying the transfer and recordation taxes on the numerous property transfers that it accomplished throughout the bankruptcy period. See NVR Homes, Inc., 222 B.R. at 519. In reaching this determination, the courts relied on section 4.13 of the Plan as authorized by § 1146(c) of the Bankruptcy Code.

For convenience, we will restate the terms of those provisions here. Section 1146(c) provides that "[t]he issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer under a plan confirmed . . ., may not be taxed under any law imposing a stamp tax or similar tax." 11 U.S.C.A. § 1146(c). Section 4.13 of the Plan reads:

> Pursuant to section 1146(c) of the Bankruptcy Code, the issuance, transfer, or exchange of securities pursuant to the Plan, and the transfer of, or creation of any lien on, any property of any Debtor under, in furtherance of, or in connection with the Plan shall not be subject to any stamp tax, real estate transfer tax, recordation tax, or similar tax.

(J.A. at 43.) The parties do not dispute that the transfer and recordation taxes at issue fell under the plain terms of § 1146(c) or that the property transfers constituted "[t]he issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer." Instead the question presented to us is whether the transfers were made "under a plan confirmed" -- in accordance with the statute.

The lower courts reasoned that all of the property transfers consummated during the bankruptcy period were necessary to NVR's reorganization and emergence from bankruptcy. Therefore, they concluded that the transfers were "all in furtherance of, or in connection with the Plan," under section 4.13. Furthermore, the lower courts held that the necessity of the transfers satisfied § 1146(c)'s requirement that they be made "under a plan confirmed." [6] This logic has enjoyed

---

[6] The bankruptcy court stated:"NVR's transfers of real property at issue here were made clearly `in furtherance of' and `in connection with' the Plan. They were crucial to the formulation, the confirmation, and the

21

some acceptance by other courts, primarily by courts claiming to adhere to the Second Circuit's decision in City of New York v. Jacoby-Bender, Inc. (In re Jacoby-Bender, Inc.), 758 F.2d 840 (2d Cir. 1985).

In Jacoby-Bender, the Second Circuit faced the question of whether § 1146(c) could exempt a debtor from paying city transfer taxes on a Chapter 11 property sale that was not specifically authorized in a reorganization plan, which already had been confirmed by the bankruptcy court. See id. at 841; Jacoby-Bender, 40 B.R. 10, 11-12 (Bankr. E.D.N.Y. 1984). The succinct issue presented was thus whether the confirmed reorganization plan encompassed the property sale, thereby making it part of a "plan confirmed" under § 1146(c). Holding that § 1146(c) extended to the property sale, the court noted that it was irrelevant whether the plan "empower[ed] the debtor to make a specific sale or deliver a specific deed." Jacoby-Bender, 758 F.2d at 841 (emphasis added). Instead, the court framed the question as whether the sale was "necessary to the consummation of a plan." Id. at 842. The Second Circuit thus applied its test solely to interpret the extent of a reorganization plan.

Unlike the case before us, Jacoby-Bender did not deal with a pre-confirmation transfer, but a postconfirmation transfer that, although not specifically authorized by the plan, was clearly necessary to the confirmed plan's consummation, i.e., the eventual emergence from bankruptcy and, as the court decided, it was thereby implicitly authorized by the plan. Depending on the type and size of debtor at issue and the complexity of the reorganization, a reorganization plan might well be worded either in specific terms identifying each and every transfer or in much broader language that generally outlines the activ-

_____

consummation of the Confirmed Plan, and were necessary to the Debtors' emergence from bankruptcy." (J.A. at 286-87.)

Similarly, the district court stated: "[T]he post-petition, pre-confirmation property transfers here in issue enabled NVR to remain a viable operation and avoid liquidation. Thus, nothing in the language of the Plan nor in the statutory exemption itself restricts the application of § 1146(c) to transactions occurring after the Plan's confirmation." NVR Homes, Inc., 222 B.R. at 519 (footnote omitted).

22

ities that must occur to consummate the plan. We do not take issue with the Second Circuit's logic as it was applied in Jacoby-Bender because it was employed to interpret a plan-- i.e., to identify which transfers were necessary to, and thus contemplated by, "a plan confirmed."

Lower courts, however, have extended the Second Circuit's language and altered Jacoby-Bender's holding, changing the test from "necessary to the consummation of a plan," to "necessary to the confirmation of a plan." See City of New York v. Smoss Enters. Corp. (In re Smoss Enters. Corp.), 54 B.R. 950, 951 (E.D.N.Y. 1985) (finding that a sale was under a plan because "the transfer of property was essential to the confirmation of the plan" (emphasis added)). Courts began using this seemingly slight alteration of the Second Circuit's language -- "confirmation" for "consummation" -- and applied it to the interpretation of the scope of § 1146(c) itself, rather than just a plan's provisions.

The fundamental difference between the consummation of a plan and the confirmation of a plan is the timing of the events within the bankruptcy process. Consummation or execution of a reorganization plan cannot take place until the bankruptcy court first confirms a plan. See Fed. R. Bankr. P. 3020, 3022. By changing and applying Jacoby-Bender's holding to new and different circumstances, courts used this altered analysis not only to determine what transfers were "under a plan," but also what transfers were "under a plan confirmed." These decisions embraced the belief that if a transfer was "essential to the confirmation of the plan," then it was "under a plan confirmed." See In re Permar Provisions, Inc., 79 B.R. 530, 534 (Bankr. E.D.N.Y. 1987). Naturally, many preconfirmation transfers then were held to fall under § 1146(c), something that the Second Circuit never held. See Smoss Enters. Corp., 54 B.R. at 951; In re Lopez Dev., Inc., 154 B.R. 607, 609 (Bankr. S.D. Fla. 1993); In re Permar Provisions, Inc., 79 B.R. at 534. We think it is error to twist the Second Circuit's language to the defeasance of § 1146(c)'s own terms.

Although § 1146(c) relies upon the interpretation of a reorganization plan to determine which transfers fall within the scope of the plan itself, § 1146(c) determines the ultimate extent of its operation. Therefore, holding that every transfer "essential" to a plan's confirmation

23

is by definition "under a plan confirmed" is fundamentally flawed. Such a holding makes a plan's terms the master of § 1146(c), instead of deferring to the statute itself. Accordingly, we believe the proposition that every transfer necessary to the confirmation of a plan is "under a plan confirmed" to be without basis in § 1146(c).

In the case before us, NVR advances this flawed logic to claim exemptions on all of its bankruptcy period transfers, both pre- and post-Plan confirmation. The taxing authorities argue to the contrary that any transfers in the ordinary course of business taking place prior to the Plan's confirmation date are not exempt from the recordation and transfer taxes. Although we think it irrelevant under § 1146(c) whether the transfers took place in the ordinary course of business, we agree with the taxing authorities regarding the timing of § 1146(c)'s application, and conclude that transfers taking place prior to the date of a reorganization plan's confirmation are not covered by § 1146(c).[7] First, § 1146(c) exclusively, and not a plan's provisions, control the extent of the statute's own operation. Second, the language of § 1146(c) is plain and requires no great manipulation to interpret its terms.

We are guided to a restrictive interpretation of § 1146(c)'s reach by the Supreme Court's holding in California State Board of Equalization v. Sierra Summit, Inc., 490 U.S. 844 (1989), which stated that "[a]lthough Congress can confer an immunity from state taxation, . . . a court must proceed carefully when asked to recognize an exemption from state taxation that Congress has not clearly expressed." Id. at 851-52 (citations and internal quotation marks omitted). This passage clearly indicates that tax exemptions should be construed narrowly in favor of the state. It follows that we cannot allow private parties, who would fervently pursue every possible tax advantage, to interpret and extend statutory tax exemptions through the auspices of a reorganization plan, even if the plan is eventually confirmed by a court.

_____

[7] The local taxing authorities do not argue that the transfers occurring after the date of confirmation and during the remainder of the bankruptcy period are covered by 11 U.S.C.A. § 1146(c) (West 1993).

24

The relatively straightforward issue before us is thus whether pre-confirmation transfers are "under a plan confirmed." The district court concluded that neither "the language of the plan nor . . . the statutory exemption itself restricts the application of § 1146(c) to transactions occurring after the Plan's confirmation." NVR Homes, Inc., 222 B.R. at 519. Because we are bound to interpret the text of § 1146(c) in accordance with its plain meaning using the ordinary understanding of words, we must disagree. See Perrin v. United States, 444 U.S. 37, 42 (1979).

There is no question that the Plan was eventually confirmed and thus became a "plan confirmed." Furthermore, because the Plan covered all transfers "in furtherance of, or in connection with the Plan," we have no doubt that, if allowed by § 1146(c), the Plan as confirmed would encompass the preconfirmation transfers. The question is whether the word "under," as used in § 1146(c), could extend the statute's effect to preconfirmation transfers. To ascertain the ordinary understanding of "under," we turn to the dictionary. See MCI Telecomm. Co. v. AT&T Corp., 512 U.S. 218, 228 (1994) (discussing the use of dictionary definitions to interpret statutory text). Black's Law Dictionary defines "under" as "`inferior' or `subordinate.'" Black's Law Dictionary 1525 (6th ed. 1990). Another standard dictionary defines "under" as "[w]ith the authorization of." See Webster's II New Riverside University Dictionary 1256 (1988). Logically reading these definitions in the context of § 1146(c), we cannot say that a transfer made prior to the date of plan confirmation could be subordinate to, or authorized by, something that did not exist at the date of transfer -- a plan confirmed by the court.

NVR states that "[c]onsistent with the legislative history and judicial interpretations of § 1146(c), NVR's Confirmed Plan (Section 4.13), and the Court's Confirmation Order[, NVR was] provided [with] a § 1146(c) exemption for transfer of any [of its] property `under, in furtherance of or in connection with' the Plan." (Appellee's Br. at 28-29.) In other words, by mixing § 1146(c), the Plan, the bankruptcy court's order, and a dash of legislative history, private parties in partnership with federal courts can create new and improved tax exemptions for debtors in reorganization proceedings. We do not take the statutory mandates of Congress and the integrity of local law so lightly, nor do we view our own power so expansively. Instead, Con-

25

gress alone, acting according to its legislative authority under the Bankruptcy Clause in conjunction with the Supremacy Clause, has the ability to preempt the enforcement of other law in the bankruptcy context. See, e.g., Railway Labor Executives' Ass'n v. Gibbons, 455 U.S. 457, 473 (1982); Perez v. Campbell, 402 U.S. 637, 652 (1971); Antonelli, 123 F.3d at 781. It has done so plainly through the language of § 1146(c).

We must conclude that Congress, by its plain language, intended to provide exemptions only to those transfers reviewed and confirmed by the court. Congress struck a most reasonable balance. If a debtor is able to develop a Chapter 11 reorganization and obtain confirmation, then the debtor is to be afforded relief from certain taxation to facilitate the implementation of the reorganization plan. Before a debtor reaches this point, however, the state and local tax systems may not be subjected to federal interference. Reasonable or not, however, we are bound to implement the statute as it is written, and, therefore, hold that the tax exemptions contained in§ 1146(c) may apply only to transfers under the Plan occurring after the date of confirmation.

III.

Summarizing our decision, because the Eleventh Amendment grants immunity to Maryland and Pennsylvania, the judgment is reversed and the district court's order is vacated as to the state taxing authorities. Because we determine that 11 U.S.C.A.§ 1146(c) (West 1993) does not exempt NVR from paying transfer and recordation taxes to the local taxing authorities prior to the Plan's confirmation, we also reverse the district court's decision insofar as it allowed tax exemptions on transfers occurring prior to the date of Plan confirmation. We do, however, affirm the district court's conclusion that § 1146(c) grants tax exemptions to property transfers occurring under the confirmed Plan, and thus district court's judgment stands to the extent it covers transfers occurring after the date of Plan confirmation.

VACATED IN PART, AFFIRMED IN

PART, AND REVERSED IN PART

26

WILKINSON, Chief Judge, concurring in part and concurring in the judgment:

I concur in sections I and II.A of the majority opinion. I also agree that 11 U.S.C. § 1146(c) does not apply to preconfirmation transfers. I do not agree, however, that the section's plain language compels this conclusion.

Section 1146(c) provides:

> The issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer under a plan confirmed under section 1129 of this title, may not be taxed under any law imposing a stamp tax or similar tax.

The majority holds that the phrase "under a plan confirmed under section 1129 of this title" plainly excludes transfers occurring prior to confirmation. The majority finds this plain meaning in the word "under," which it defines as "`inferior' or `subordinate.'" See ante at 25 (quoting Black's Law Dictionary 1525 (6th ed. 1990)). Because, the majority concludes, "a transfer made prior to the date of plan confirmation could [not] be subordinate to . . . something that did not exist at the date of transfer -- a plan confirmed by the court," the term "under" must limit section 1146(c)'s applicability to postconfirmation transfers. Id.

With respect, I disagree. It is not plain to me that section 1146(c) contains a temporal element. It is also not clear that one must read the section to say anything about the relationship between plan confirmation and the timing of a transfer. It is equally possible that the provision requires only that the transfer occur "under" -- i.e., that it be inferior or subordinate to -- "a plan" that is ultimately "confirmed." In other words, the fact rather than the timing of plan confirmation is the critical issue. In a complicated reorganization a debtor-in-possession may operate for some time pursuant to the terms of an unconfirmed plan while it negotiates with its creditors. It is far from obvious that those transfers fall outside section 1146(c).*

_____

*If Congress used the words "under a plan ultimately confirmed," that would have made the matter clear. Or if Congress used the words "under a confirmed plan," that would have made its intentions obvious. Congress used neither phrasing -- hence the ambiguity.

27

Moreover, reading the phrase to require only that the plan ultimately be confirmed would comport with a central purpose of our bankruptcy laws: "permitting business debtors to reorganize and restructure their debts in order to revive the debtors' businesses and thereby preserve jobs and protect investors." Toibb v. Radloff, 501 U.S. 157, 163 (1991); see also Landmark Land Co. v. Resolution Trust Corp. (In re Landmark Land Co.), 973 F.2d 283, 288 (4th Cir. 1992) ("[T]he purpose of Chapter 11 is reorganization . . . ."). Applying section 1146(c) to transfers made during the preconfirmation period may provide substantial funds to the debtor. See, e.g., In re Lopez Dev., Inc., 154 B.R. 607 (Bankr. S.D. Fla. 1993) (exempting preconfirmation transfers from $33,600 in stamp taxes). These funds would permit the debtor to emerge from bankruptcy and thereby to generate substantial long-term tax revenues.

Nevertheless, the majority's reading of section 1146(c) is a reasonable one. And when construing an alleged federal abrogation of state and local taxing authority a "court must proceed carefully." California State Bd. of Equalization v. Sierra Summit, Inc., 490 U.S. 844, 851 (1989) (internal quotation marks omitted). If Congress wished to exempt a bankrupt from state and municipal taxation,"the intention would be clearly expressed, not left to be collected or inferred from disputable considerations of convenience in administering the estate of the bankrupt." Swarts v. Hammer, 194 U.S. 441, 444 (1904). I therefore believe it proper to construe section 1146(c) to include only postconfirmation transfers, not because the section's language is patent, but because concerns of federalism require the narrower interpretation.

28