**In re BEULAH CHURCH OF GOD IN CHRIST JESUS, INC., Debtor.**

**No. 03–42705 (RDD).**

United States Bankruptcy Court, S.D. New York.

Oct. 18, 2004.

James E. Hurley Jr., New York City, for debtor in possession.

Corporation Counsel of the City of New York, by Michael A. Cardozo and Brian J. Markowitz, New York City, for New York City Finance Department.

Emmet, Marvin & Martin, LLP, by Eric Reuben and Anna Karpman, New York City, for Residential Funding Corporation.

*MEMORANDUM DECISION AND ORDER GRANTING REQUEST FOR EXEMPTION AND DENYING OBJECTION TO EXEMPTION FROM TRANSFER TAX UNDER 11 U.S.C. § 1146(c)*

ROBERT D. DRAIN, Bankruptcy Judge.

The debtor and debtor in possession, Beulah Church of God in Christ Jesus, Inc. (the "Debtor"), moved under sections 363(b) and (f) of the Bankruptcy Code, 11

U.S.C. §§ 101 *et seq.*, to sell twenty-three buildings. Before the Debtor filed its motion, it had filed a chapter 11 plan and disclosure statement. The Debtor obtained Court approval of the sale and the sale closed, however, before the confirmation of its chapter 11 plan under section 1129 of the Bankruptcy Code.

The New York City Department of Finance (the "City") objected to the Debtor's request that the sale be exempt from the New York City real property transfer tax [1] and the New York City mortgage recording tax [2] (together, the "Transfer Taxes") pursuant to section 1146(c) of the Bankruptcy Code,[3] because the transfers giving rise to the Transfer Taxes [4] occurred before confirmation of the Debtor's plan.

This Memorandum Decision states the Court's reasons for determining that the sale is subject to the tax exemption under section 1146(c) of the Bankruptcy Code and denying the City's objection.

*Background*

The Debtor, which is owned by a church in Brooklyn, filed its voluntary chapter 11 petition on November 18, 2003. It owned or had an interest in twenty-four properties located in New York, Kings, Queens and Bronx Counties.

The Debtor's chapter 11 case has not been smooth; at times it has been contentious. It presently appears to have been remarkably successful, however, in large measure because the Debtor has acted diligently and responsibly under chapter 11 to maximize the value of its estate and pay its creditors.

The Debtor got involved in real estate and incurred the debt that precipitated its chapter 11 case by becoming a participant in a federal loan insurance program, known as the "203(k) program," administered by HUD.[5] In the 203(k) program, the federal government guarantees mortgage loans to not-for-profit entities for the purpose of rehabilitating housing stock. Unfortunately, the program appears to have been susceptible to abuse by contractors, sometimes in concert with real estate brokers and loan originators, who induced exorbitant borrowing and overbilled unsophisticated not-for-profits for shoddy or non-existent repairs,[6] with the result that loans intended to be serviced by income from rehabilitated buildings went into default when the buildings never were rehabilitated. For reasons discussed below, the Court never determined whether the Debtor and HUD were preyed upon in this way, but it is clear that when the Debtor filed its chapter 11 petition it had incurred approximately $12 million of secured debt under the 203(k) program, as well as a substantial amount of unpaid taxes, while its buildings had not yet been repaired, were largely unoccupied and were producing no income.

---

1. *See* Chapter 21, § 11–201 *et seq.* of the New York City Administrative Code.

2. *See* N.Y. Tax Law § 253 (McKinney 2004).

3. Section 1146(c) of the Bankruptcy Code states,

> The issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer under a plan confirmed under section 1129 of this title, may not be taxed under any law imposing a stamp tax or similar tax.

11 U.S.C. § 1146(c) (2004).

4. The parties agree that, if the sale is exempt under section 1146(c), the Transfer Taxes are "stamp or similar tax[es]" covered by that section.

5. *See* 12 U.S.C. §§ 1709, 1710, 1715(b), 1715(u), 1715(z)–16; 42 U.S.C. § 3535(d).

6. *See, e.g., Ifill v. West*, 1999 WL 690144, 1999 U.S. Dist LEXIS 21320 (E.D.N.Y. August 24, 1999); *United States v. Fox*, CR 02 1344 (E.D.N.Y. March 7, 2003) (Transcript of Plea)

Residential Funding Corporation ("RFC"), the current first mortgage lender on most of the Debtor's properties, moved early in the case for relief from the automatic stay to foreclose on its collateral. It sought such relief under section 362(d)(1) of the Bankruptcy Code for cause, arguing that the Debtor had filed under chapter 11 on the eve of foreclosure in bad faith and that, in any event, RFC's mortgage interests in the buildings were not adequately protected.

Initially, the Debtor suggested that it was going to challenge the *bone fides* of RFC's liens in connection with issues raised by the 203(k) program, but, when faced with the preclusive effect of RFC's prepetition judgments against it, the Debtor changed its approach, stating that it intended to sell the properties upon which RFC held a mortgage, as well as other properties that were subject to mortgages held by another lender. Given increases in real estate values since the loans' incurrence, the Debtor believed that a vigorous marketing process would bring prices satisfying not only the secured debt but also all or a substantial portion of the unsecured debt and, perhaps, leave money left over for the church.

At first, RFC opposed the Debtor's request, but it was persuaded that the Debtor's proposed sale process (which, importantly, provided for substantial involvement by RFC and the other secured creditor), was the best way to get its loans paid.[7] This meant that, subject to the Debtor's proper conduct of the sale process, the automatic stay would not be lifted and the case would not be dismissed or converted to chapter 7. Instead, assuming a successful sale process, the case was put on track for eventual confirmation of a chapter 11 plan.[8]

On January 14, 2004, the Debtor filed its motion for an order authorizing the sale of twenty-four of its properties (it later removed one of the properties from the list, however, intending to reinstate the mortgage debt on that property under section 1124 of the Bankruptcy Code), in bulk or individually, at an auction. The Debtor's application also sought a declaration pursuant to section 1146(c) of the Bankruptcy Code that the sale would be exempt from any stamp or similar tax on the transfer. By order dated February 4, 2004, the Court approved the notice of sale, scheduled the auction sale of the properties for April 5, 2004, and scheduled the hearing to approve the sale to follow the auction.

The City filed its limited objection on March 18, 2004, agreeing, however, that the sale could proceed if at least the amount of the transfer tax was reserved in an interest bearing escrow account. By order dated April 5, 2004, the Court approved the properties' sale in bulk to the winning bidder at the auction.

---

7.  HUD, perhaps the ultimate party in interest, has not been involved in any aspect of this chapter 11 case to protect its interests or otherwise, notwithstanding that it has been given notice of all significant proceedings.

8.  Following the hearing on RFC's lift-stay motion, the Court found that the Debtor had not filed for bankruptcy relief in bad faith: not only was the Debtor pursuing confirmation of a chapter 11 plan but also there was a reasonable possibility that such a plan would be confirmed within a reasonable time. *See C–*

*TC 9th Ave. P'ship v. Norton Co. (In re C–TC P'ship)*, 113 F.3d 1304, 1310 (2d Cir.1997); *Baker v. Latham Sparrowbush Assoc. (In re Cohoes Indust. Terminal, Inc.)*, 931 F.2d 222, 227 (2d Cir.1991); *In re 68 West 127 St. LLC*, 285 B.R. 838, 847 (Bankr.S.D.N.Y.2002). In contrast, the Court has dismissed other cases by unrelated debtors that were precipitated by loans in connection with the 203(k) program as having been filed and pursued in bad faith. *In re St. Stephen's 350 East 116th St.*, 313 B.R. 161 (Bankr.S.D.N.Y.2004).

The Court heard oral argument on the City's objection, which was opposed by the Debtor and RFC, on April 21, 2004.

Perhaps not coincidentally, given the nature of the section 1146(c) issue, the Debtor filed its chapter 11 plan on April 20, 2004 and on April 22, 2004 filed a disclosure statement for the plan under section 1125 of the Bankruptcy Code.

Notwithstanding the approval of the sale on April 5, 2004, the Debtor continued to have its hands full, because the sale did not close, the buyer having defaulted. Receiving some, but not open-ended, grace from its secured creditors, the Debtor again sought to sell the properties, however, and it eventually succeeded in finding a new buyer.[9] Indeed, the new buyer agreed to pay a substantially higher purchase price for all of the properties, in bulk, than the buyer at the previous auction. On June 22, 2004 the Debtor therefore again moved for approval of the sale of the twenty-three properties, and by order dated July 1, 2004 the Court approved the Debtor's motion to enter into a sale contract with the new buyer under sections 363(b) and (f) of the Bankruptcy Code.

The Debtor having renewed its request for a tax exemption under section 1146(c) with respect to this proposed sale, the July 1 order also provided,

> [A]ll issues with respect to whether and to what extent section 1146(c) of the Bankruptcy Code applies to the sale of Properties are fully reserved for determination, either based on the existing record and pleadings regarding such issue or after a further hearing. The Court shall inform the Debtor and the City of New York whether it intends to

hold a further hearing on this issue and accept additional pleadings or to rely on the existing record.

The sale closed on or about July 30, 2004, the eve of the expiration of the grace period agreed to by the secured creditors. Sale proceeds equal to at least the maximum amount of the Transfer Taxes (approximately $390,000) have been held in escrow since the closing, pending determination whether the sale is exempt from such taxes under section 1146(c) of the Bankruptcy Code. On or shortly after the closing, RFC's allowed claims, as well as the City's other allowed claims, were paid in full. The Debtor also has recently agreed on the allowed amount of the secured claims of the other creditor under the 203(k) program and paid such of those claims that were secured by the sale proceeds, as well as confirming its intention to treat the debt secured by the twenty-fourth, unsold property as unimpaired under its chapter 11 plan.

The Debtor has also scheduled a hearing on its disclosure statement. Thus, the Debtor's plan has not yet been voted on or, of course, confirmed. The Court can see no major obstacle, however, to the plan's eventual confirmation now that the results of the sale process are known. Although it is not clear whether there will be enough of a surplus in the estate for a meaningful recovery by the Debtor's shareholder—the church—the Debtor's chapter 11 plan provides for the payment of administrative, priority, and general unsecured claims in full.

Given that the parties filed their pleadings in the context of a sale to a different purchaser slated to close at a different

---

**9.** It was clear that if the Debtor had not been able to find the new buyer when it did, RFC's motion for relief from the automatic stay, which it had renewed after the first sale collapsed, would have been promptly heard and granted, and the case probably would have been converted to chapter 7.

time, the Court set an August 16, 2004 deadline to submit any additional pleadings on the section 1146(c) issue or to request another hearing. Both the City and the Debtor replied that they did not need another hearing or more pleadings.

### Discussion

The City objects to the requested exemption from the Transfer Taxes arguing that the Debtor's buildings were not sold "under a plan confirmed" within the meaning of section 1146(c) of the Bankruptcy Code. That is, the City argues, the sale cannot be exempt from the Transfer Taxes because the sale was not authorized by, provided for in, and did not occur pursuant to, a confirmed chapter 11 plan.

The Debtor and RFC argue, on the contrary, that section 1146(c) does not condition exemption from the Transfer Taxes on confirmation of a chapter 11 plan before the closing of such a sale, but, rather, that the sale may be exempt provided that the sale is integral to plan confirmation, or confirmation occurs because of the sale. In the Debtor's interpretation, therefore, the phrase "under a plan confirmed", as used in section 1146(c) of the Bankruptcy Code, means that the sale is in view of, and/or in accordance with, and subject to, the anticipated confirmation of a chapter 11 plan.

This timing issue has generated conflicting opinions. *Compare In re Smoss Enter. Corp,* 54 B.R. 950, 951 (E.D.N.Y.1985), *aff'd without opinion,* 1986 U.S.App. LEXIS 28677 (2d Cir. March 31, 1986); *In re GST Telecom, Inc.,* 2002 WL 442233, 2002 U.S. Dist. LEXIS 4662 (D.Del. March 20, 2002); *In re Linc Capital, Inc.,* 280 B.R. 640, 646 (Bankr.N.D.Ill.2002); *In re Permar Provisions, Inc.,* 79 B.R. 530, 534 (Bankr.E.D.N.Y.1987) (each holding that section 1146(c)'s exemption applies although a chapter 11 plan is not confirmed until after the sale giving rise to transfer

taxes), *and Baltimore County v. Hechinger Liquidation Trust (In re Hechinger Inv. Co. of Del., Inc.),* 335 F.3d 243, 253–55 (3d Cir.2003); *NVR Homes, Inc. v. Clerks of Circuit Courts (In re NVR, L.P.),* 189 F.3d 442, 456–58 (4th Cir.1999), *cert. denied,* 528 U.S. 1117, 120 S.Ct. 936, 145 L.Ed.2d 815 (2000); *States of Illinois & Washington v. Nat'l Steel Corp. (In re Nat'l Steel Corp.),* 2003 WL 22089881, 2003 U.S. Dist. LEXIS 15695 (N.D.Ill. September 8, 2003) (each holding that section 1146(c)'s exemption requires confirmation of a chapter 11 plan before the sale). *See also In re 310 Assocs., L.P.,* 282 B.R. 295, 300–01 (S.D.N.Y.2002) (section 1146(c) exemption does not apply where chapter 11 plan had not even been filed months after the sale); and *In re The Baldwin League of Independent Schools,* 110 B.R. 125, 126–7 (S.D.N.Y.1990) (section 1146(c) exemption applies to mortgage recording tax incurred upon financing that was the source of funding for a subsequently confirmed chapter 11 plan). Many of these opinions also contain differing interpretations of the seminal case from this Circuit regarding section 1146(c), *In re Jacoby–Bender, Inc.,* 758 F.2d 840 (2d Cir.1985), although, of course, *Jacoby–Bender* is not binding on courts outside of this Circuit.

As with all issues of statutory interpretation, though, one must begin with the words of the statute, and, if those words are unambiguous, also end there, unless the unambiguous meaning leads to a result that is either absurd or demonstrably at odds with the drafters' intention. *Lamie v. United States Trustee,* 540 U.S. 526, 124 S.Ct. 1023, 1030, 157 L.Ed.2d 1024 (2004) (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,* 530 U.S. 1, 6, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000)); *see also United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). Hav-

ing stated this fundamental principle, however, it is tempting, given the number of courts that have expressed divergent views about the provision's proper interpretation,[10] to conclude that section 1146(c)'s language must be ambiguous. But the Supreme Court has repeatedly ruled that erroneous methods of statutory construction may result in the discovery of false ambiguities, see, e.g., Lamie, 124 S.Ct. at 1030; Ron Pair, 489 U.S. at 242 n. 5, 109 S.Ct. 1026. Accordingly, section 1146(c) should be reviewed anew to determine whether the alleged ambiguity in its use of "under a plan confirmed" is merely a matter of lawyers' facile distinctions or is real.

On first reading, section 1146(c)'s use of the word "confirmed" may seem to require that a plan have been confirmed before the transfer if the debtor is to receive the tax exemption. However, upon closer reading, both the City's and the Debtor's interpretations could apply, and there are good reasons for concluding that the interpretation offered by the Debtor—that the sale only need be in view of and integral to a plan (provided that the plan is subsequently confirmed)—is more apt than that the sale must be authorized by or provided for in an already confirmed plan. As noted by the concurring opinion in NVR, section 1146(c)'s use of the words "plan confirmed" is not dispositive: "If Congress used the words 'under a plan ultimately confirmed,' that would have made the matter clear. Or if Congress used the words 'under a confirmed plan,' that would have made its intentions obvious. Congress used neither phrasing—hence the ambiguity." NVR, 189 F.3d at 458 n. *. In other words, "confirmed" as used in section 1146(c) may be read as either fixing the date of the

transfer or describing a condition, which may be a condition subsequent.

Focus then turns to the word "under" as used in section 1146(c)'s "under a plan confirmed." Unfortunately, that word also is susceptible to both the City's and the Debtor's interpretations. Thus, The American Heritage Dictionary of the English Language (New College Edition 1981) defines "under" as "subject to the restraint or obligation of: under contract," as well as "subject to the authority, rule or control of: under a dictatorship," which would support the City's reading of Congress's intention when it enacted section 1146(c) of the Bankruptcy Code in 1978. On the other hand, the same dictionary also defines "under" as "in the process of: under discussion," and "in view of; because of: under these conditions," which supports the Debtor's reading that the exemption is subject to a condition, which may be a condition subsequent, of plan confirmation, as long as the transfer led to or was in view of a plan that was ultimately confirmed.

The majority in NVR relied upon only the former definitions of "under"—that is, "with the authorization of" or "inferior" or "subordinate to"—rather than recognizing the parallel existence of the latter, in reaching its "plain meaning" conclusion. NVR, 189 F.3d at 457. The majority in Hechinger, on the other hand, at least recognized that "[t]he preposition 'under' is of course very common, and it can have many different meanings in different contexts." Hechinger, 335 F.3d at 252. It further noted that the reading "authorized by" is not the only plausible interpretation of "under": "[f]or example, an accepted

10. This divergence is reflected in, among other places, the dissenting opinion in Baltimore County v. Hechinger Liquidation Trust (In re Hechinger Inv. Co. of Del., Inc.), 335 F.3d 243, 257 (3d Cir.2003), as well as the concurring

opinion in NVR Homes, Inc. v. Clerks of Circuit Courts (In re NVR, L.P.), 189 F.3d 442, 458 (4th Cir.1999), which expressly did not rely on the majority's reading of section 1146(c)'s "plain meaning."

definition of the preposition 'under' is 'in accordance with,' and 'accordance', may mean 'agreement.'" *Id.* at 252–53. Ultimately, therefore, the court in *Hechinger* did not rely on a plain meaning argument, but, rather, on textual analysis of other parts of the Bankruptcy Code as well as on two canons of statutory construction to reach its conclusion that the City's interpretation of section 1146(c) was the most natural and proper reading. *Id.* at 253–54.

Before also turning to secondary aids to statutory interpretation, however, two points should be noted. First, unlike the present matter, there was no chapter 11 plan on file and pending confirmation in either *NVR* or *Hechinger. See NVR,* 189 F.3d at 447–48 (debtor's subsequently-confirmed plan purported to ratify the tax-exempt nature of thousands of sales that the debtor had previously made during its chapter 11 case in the ordinary course of its real estate business); [11] *Hechinger,* 335 F.3d at 246–48.

The *NVR* and *Hechinger* courts, therefore, did not have occasion to consider a situation like the Debtor's, where the sales at issue were specifically pursued in view of a filed plan and, in fact, where the Debtor kept its chapter 11 case alive by convincing the secured creditors and the Court that it should be given the chance to conduct such a process. The *NVR* and *Hechinger* courts, thus naturally would not have focused on the definition of "under" as meaning "in the process of" or "in view of" or "in accordance with" because the sales in those cases were not, except artificially and retroactively, "in view of" a plan.

In contrast with *NVR* and *Hechinger,* however, one of the leading cases supporting the Debtor's interpretation of section 1146(c), *In re Permar Provisions,* 79 B.R. 530, 530 (Bankr.E.D.N.Y.1987), involved a fact pattern quite similar to the Debtor's. In that case, Judge Duberstein noted that the debtor had been faced with a motion to convert its chapter 11 case to a case under chapter 7. However,

> [a]s a result of the debtor's efforts to avoid the conversion, it met with the Committee to work out an acceptable plan of reorganization. The Committee was informed by the debtor that it intended to sell its newly acquired, vacant meat packing plant and contents to fund a plan of reorganization. In light of the foregoing, the Committee, through its counsel, then informed the creditor body of the debtor's intention. The creditors were also informed that the filing of a plan and requisite disclosure statement would occur following the sale. The Committee's motion to convert the case was adjourned *sine die.*

*Id.* at 531. The court found that the sale, although occurring before plan confirmation, was nevertheless "under a plan," *id.* at 534, a conclusion difficult to dispute given the sale's context.

Second, although they addressed this Circuit's decision in *In re Jacoby–Bender Inc.,* 758 F.2d 840 (2d Cir.1985), neither *NVR* nor *Hechinger* nor the other courts that have categorically refused to apply section 1146(c) to any pre-confirmation transfers were bound, as is this Court, by *Jacoby–Bender.* And while the facts of *Jacoby–Bender* are not on all fours with the present facts, the logic of that case strongly supports the Debtor's argument.

The *Jacoby–Bender* bankruptcy court's opinions make the extent of the factual difference clear: unlike in the present

---

**11.** Indeed, because the sales at issue in *NVR* were conducted in the ordinary course of the debtor's business, *NVR,* 189 F.3d at 447, and not in furtherance of a chapter 11 plan process, those sales would not have been exempt under the Debtor's interpretation of section 1146(c).

case, confirmation of the chapter 11 plan in *Jacoby–Bender* occurred before the bankruptcy court approved the sale at issue. *Compare In re Jacoby–Bender, Inc.*, 34 B.R. 60, 62 (Bankr.E.D.N.Y.1983) (before plan had been confirmed, court refused to declare debtor was entitled to exemption under section 1146(c), "since it is impossible to ascertain whether the transfer will take place under a confirmed plan, as the Court has not yet had the opportunity to pass upon that matter")[12] *and In re Jacoby–Bender, Inc.*, 40 B.R. 10, 11–12 (Bankr. E.D.N.Y.1984) (plan confirmed on November 10, 1983; Court approved the sale on January 12, 1984—although, as noted by at least one other court, *see In re Linc Capital*, 280 B.R. 640, 646–47 (Bankr.N.D.Ill. 2002), the actual delivery of the deed giving rise to the stamp tax in *Jacoby–Bender* appears to have occurred or been provided for before plan confirmation).

*NVR*, 189 F.3d at 455–56, and *Hechinger*, 335 F.3d at 255–56, make much of this timing distinction. However, the Second Circuit resolved the issue in *Jacoby–Bender* based on a practical, or functional interpretation of section 1146(c)'s use of the phrase "under a plan," thus negating the logic of such a bright-line test. In *Jacoby–Bender*, the City contended that section 1146(c) did not apply to exempt the sale because the confirmed chapter 11 plan made no mention of the sale. *Jacoby–Bender*, 758 F.2d at 841. How, the City argued, could the sale be "under a plan" if it was not authorized in the plan? *Id.*

Thus, in *Jacoby–Bender* the City relied on essentially the same definition of "under a plan confirmed" that has since been adopted by *NVR*, 189 F.3d at 457, and *Hechinger*, 335 F.3d at 252. The Second Circuit, though, did not accept this argument:

> We disagree. The statute does not require that the reorganization plan include specifics. The City articulates no policy reason why Congress would have required specifics; indeed, Congress's apparent purpose in enacting section 1146 was to facilitate reorganizations through giving tax relief, a purpose served equally well when the reorganization plan leaves details to be settled in the future. Here, as the bankruptcy court found, "the plan's consummation depended almost entirely upon the sale of the building," the sale in turn depending upon the delivery of the deed. *That the plan did not empower the debtor to make a specific sale or deliver a specific deed is irrelevant to our determination that the delivery of the deed took place "under" the plan within the meaning of section 1146(c).*

*In re Jacoby–Bender*, 758 F.2d at 841 (emphasis added).[13]

Given the Second Circuit's emphasis on cause and effect, *id.* at 841, 842, it is not hard to see why later decisions by district and bankruptcy courts in this Circuit held that transfers integral to the *confirmation* of a plan should be as exempt under section 1146(c) as transfers necessary for the

---

**12.** Later courts have dealt with this uncertainty by requiring the debtor to escrow cash at least equal to the taxes in dispute, pending plan confirmation. *See, e.g., In re 310 Assocs.*, 282 B.R. at 297–98.

**13.** The distinction between the logic of *Jacoby–Bender* and the holding of *Hechinger* and similar cases is highlighted, moreover, by the fact that the City also made a closely related point in *Jacoby–Bender* that was also relied upon in *Hechinger*. Both contended that the debtor made the transfer not under the plan, which did not mention the transfer, but under the separate authority of 11 U.S.C. § 363(b). *See Jacoby–Bender*, 758 F.2d at 841; *Hechinger*, 335 F.3d at 252 ("[T]he transfers at issue in this case were not made under the authority of the plan that was eventually confirmed. Rather, they were made under the authority of 11 U.S.C. §§ 363 and 365."). The Second Circuit did not accept the City's argument. *Jacoby–Bender*, 758 F.2d at 841.

plan's *consummation*. *See, e.g., In re The Baldwin League of Independent Schools,* 110 B.R. 125, 127 (S.D.N.Y.1990) (pre-confirmation mortgage financing was a "reasonably necessary step in consummating the plan"); *In re Smoss Enter.,* 54 B.R. 950, 951 (E.D.N.Y.1985) (expressly finding the reasoning of *Jacoby–Bender* applicable to transfers essential to confirmation as well as consummation of a plan); *In re Permar Provisions,* 79 B.R. 530, 534 (Bankr.E.D.N.Y.1987). *Cf. In re 310 Assocs.* 282 B.R. 295, 300–301 (S.D.N.Y. 2002) (distinguishing *Jacoby–Bender, Smoss* and *Permar Provisions* because the particular transfer at issue preceded even the drafting of a plan, which had not even been filed several months later, when the district court heard the appeal). Thus it appears that *NVR's* argument that these later cases from this Circuit have misapplied *Jacoby–Bender* by substituting "confirmation" for "consummation", *NVR,* 189 F.3d at 456, gives too short shrift to *Jacoby–Bender's* rationale. (One can take further comfort in reaching this conclusion from the fact that *Smoss Enter.* was affirmed, albeit without opinion. *In re Smoss Enter.,* 186 U.S.App. LEXIS 28677 (2d Cir. March 31, 1986)).

Are the results of any well-recognized aids to statutory interpretation sufficiently compelling to counteract the foregoing considerations? *Jacoby–Bender* relied to some extent on the legislative history of a predecessor statute to section 1146(c) of the Bankruptcy Code for the proposition that section 1146(c)'s exemption is intended to apply to any transfer, whether or not specifically addressed by a plan, as long as it serves to "execute or make effective a plan." *Jacoby–Bender,* 758 F.2d at 842. However, the legislative history of section 1146(c) is, at best, scant, indirect and uninformative.[14] *See, e.g., Nat'l Steel,* 2003 WL 22089881, 2003 U.S. Dist LEXIS 15695 (legislative history, based on wording of predecessor statutes, supports either view of the timing issue, shedding no additional light); *In re Permar Provisions,* 79 B.R. at 533. *See also In re 995 Fifth Ave. Assocs., L.P.,* 963 F.2d 503, 510 (2d Cir.1992), *cert. denied,* 506 U.S. 947, 113 S.Ct. 395, 121 L.Ed.2d 302 (1992).[15]

Textual analysis of other provisions of the Bankruptcy Code does not particularly advance interpretation of section 1146(c), either. *Hechinger* supports its reading of section 1146(c) by examining the use of the word "under" in other clauses in section 1146, *Hechinger,* 335 F.3d at 253, as well as considering the meaning of the phrase "under a plan confirmed" as used in section 365(g) of the Bankruptcy Code. *Id.* at 254. However, an at least equally plausible argument can be made, based on other provisions of the Bankruptcy Code, that "When Congress wants to impose a temporal condition on a bankruptcy transaction, it does so expressly .... *e.g.,* 11 U.S.C. § 1104(a) ('At any time *after* the commencement of the case but *before* the con-

---

**14.** Perhaps for this reason, neither *Hechinger,* 335 F.3d at 243, nor *NVR,* 189 F.3d at 442, discuss legislative history.

**15.** It is worth noting, though, that a leading pre-Bankruptcy Code treatise states, "Both the provisions of § 267 [of the Bankruptcy Act of 1898, as amended] and those of the Internal Revenue Code with its amendments ... do not extend any exemption to transactions (that is, transfers, issuance, etc.) which occur prior to confirmation of the plan and which are merely preparatory steps." 6A

*Collier on Bankruptcy* ¶ 15.08 (14th ed.1977), at 840. On the other hand, there does not appear to be any pre-Bankruptcy Code case law on this issue, and pre-Code practice was not so well developed along the lines posited by *Collier* that it raised concerns in the early cases construing section 1146(c) (for example on the part of Judge Duberstein in *Permar Provisions,* 79 B.R. at 530), that a contrary view would unduly disrupt established expectations.

firmation of a plan ...') (emphasis added); § 1105 ('At any time *before* confirmation of a plan ...') (emphasis added); § 1121(b) ('only the debtor may file a plan until *after* 120 days after the date of the order for relief ....' (emphasis added))." *In re GST Telecom*, 2002 WL 442233 at n. 6, 2002 U.S. Dist. LEXIS 4662 at n. 6. (emphasis in the original). In sum, "under" is such a commonly used word that its location in many other provisions of the Bankruptcy Code cannot help to pin down its meaning in the clause of section 1146(c) of the Code at issue here.

Another type of interpretive aid, though, requires more attention. Both *Hechinger*, 335 F.3d at 254, and *NVR*, 189 F.3d at 457, 459, rely heavily on two related canons of statutory construction: (1) tax exemptions should be strictly construed, *United States v. Centennial Savings Bank FSB*, 499 U.S. 573, 583, 111 S.Ct. 1512, 113 L.Ed.2d 608 (1991), and (2) federal laws that interfere with a state's taxation scheme should be narrowly construed in favor of the state. *Nat'l Private Truck Council v. Oklahoma Tax Comm'n*, 515 U.S. 582, 590, 115 S.Ct. 2351, 132 L.Ed.2d 509 (1995); *see also California State Bd. Of Equalization v. Sierra Summit, Inc.*, 490 U.S. 844, 851–52, 109 S.Ct. 2228, 104 L.Ed.2d 910 (1989) ("[A] court must proceed carefully when asked to recognize an exemption from state taxation that Congress has not clearly expressed.").

However, no matter how valid the principle underlying a particular canon of statutory interpretation—and the foregoing two canons obviously arise from compelling policies—such aids should be used with caution. If such care is not exercised, picking interpretive canons can be, as noted by Professor Rosenkranz, "like entering a crowded cocktail party and looking over the heads of the guests for one's friends." Nicholas Quinn Rosenkranz, *Federal Rules of Statutory Interpretation*, 115 Harv.

L.Rev.2085, at 2148 & n. 290 (2002). Continuing with the simile, the danger in choosing an interpretive canon is that it may, like an importunate acquaintance, unduly monopolize one's attention.

Thus, on closer examination it is far from clear that the bright-line test posited by the City is, in fact, a narrower construction of section 1146(c) than the Debtor's. As noted above, for example, if a plan had been confirmed before the sales in *NVR*, that decision's bright-line test would have *exempted* the debtor from transfer tax, notwithstanding that the sales were conducted in the ordinary course and had little or nothing to do with restructuring the debtor's obligations. On the other hand, under the interpretation of section 1146(c) employed by courts in this Circuit and advanced by the Debtor, the sales in *NVR* would *not* be exempt from transfer taxes. Without drawing a bright-line pre/post-confirmation distinction, therefore, Congress's purpose in facilitating reorganizations by giving tax relief, *In re Jacoby–Bender*, 758 F.2d at 841, can be harmonized with the policy of construing tax exemptions narrowly. *See In re The Baldwin League of Independent Schools*, 110 B.R. 125, 127 (S.D.N.Y.1990).

As importantly, focusing on the role of the particular transfer at issue in enabling the debtor's plan, rather than on a temporal test, recognizes the realities of how distressed businesses are restructured in chapter 11. For example, it is just as likely that a debtor may need to arrange a financing or to close a sale as a condition precedent to the parties' willingness to proceed with plan confirmation as it is for the parties to agree on the terms of a plan, obtain confirmation and then see what the sale of a key asset or a proposed financing will bring. Yet the City's bright line interpretation of section 1146(c) would admit only the latter scenario while also encompassing scenarios involving post-confirma-

tion sales that were not, however, integral to plan confirmation but, rather, simply occurred post-confirmation or were fortuitously or cleverly authorized in a plan drafted by lucky or tricky lawyers. I assume, on the contrary, that Congress intended the Debtor's approach, because it is reasonable to conclude that Congress did not intend to impose an arbitrary and illogical temporal distinction on sales necessary or integral to a chapter 11 plan.

*Conclusion*

For the foregoing reasons, because the Debtor's bulk sale of the twenty-three properties was necessary and integral to the anticipated confirmation of a chapter 11 plan in this case, the City's objection is denied. Subject to confirmation of the Debtor's chapter 11 plan, the sale of the Debtor's twenty-three properties shall be exempt from the Transfer Taxes under section 1146(c) of the Bankruptcy Code.

It is SO ORDERED.