In re PICCADILLY CAFETERIAS, INC.

State of Florida Department of Revenue, Appellant,

v.

Piccadilly Cafeterias, Inc., Appellee.

Civ. No. 06–60553.

United States District Court, S.D. Florida, Miami Division.

June 26, 2006.

---

Frederick Francis Rudzik, Tallahassee, FL, for Appellant.

Leslie Gern Cloyd, Berger Singerman, Fort Lauderdale, FL, for Appellee.

### ORDER

CECILIA M. ALTONAGA, District Judge.

**THIS CAUSE** came before the Court upon Appellant, State of Florida Department of Revenue's ("FDOR[']s") Appeal from the Final Summary Judgment Against FDOR [A.P.D.E. 22][1] entered by the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court") on March 8, 2006, in the cases styled *In re Piccadilly Cafeterias, Inc. n/k/a Capital City Cornichon Corp.*, Case No. 03–27976–BKC–RBR; and *State of Florida, Department of Revenue v. Piccadilly Cafeterias, Inc. n/k/a Capital City Cornichon Corp.*, Adv. No. 04–2310–BKC–RBR–A. The Bankruptcy Court entered Final Judgment in accordance with its ruling granting Defendant's Motion for Summary Judgment and Denying Florida Department of Revenue's Motion for Summary Judgment (A.P.D.E. 21). The adversary proceeding, and this appeal, concern FDOR's entitlement to receive tax proceeds resulting from Piccadilly Cafeterias, Inc. n/k/a Capital City Cornichon Corp.'s ("Debtor[']s]") sale of certain assets (and transfers of the deeds thereto) prior to confirmation of its plan of reorganization.[2]

FDOR has certified the following issue for the Court to consider on appeal:

---

1. This Order refers to all docket entries from the adversary proceeding styled *State of Florida, Department of Revenue v. Piccadilly Cafeterias, Inc. n/k/a Capital City Cornichon Corp.*, Adv. No. 04–2310–BKC–RBR–A as "A.P.D.E." All docket entries from the core bankruptcy proceeding, styled *In re Piccadilly Cafeterias, Inc. n/k/a Capital City Cornichon Corp.*, Case No. 03–27976–BKC–RBR are referred to as "B.P.D.E."

2. *See* 11 U.S.C. § 1129.

"Whether 11 U.S.C. § 1146(c),[3] which exempts certain transfers made pursuant to a confirmed plan of reorganization from the imposition of stamp or similar tax, applies where a transfer is made pre-confirmation, pursuant to an order under 11 U.S.C. § 363, notwithstanding the limiting language of 1146(c)." (*FDOR Brief* [D.E. 3] at 1). The Court has carefully considered the parties' written submissions and all applicable law.

## I. BACKGROUND

Although the parties do not dispute the facts giving rise to this appeal, a brief review of the case's procedural history provides some context to the present dispute. Ultimately, however, resolution of the dispute turns entirely upon a legal question.

### Course of Bankruptcy Proceedings

Prior to entering bankruptcy, Debtor was one of the largest cafeteria chains in the United States, operating 145 cafeterias throughout the southeastern portion of the United States. Among its assets, Debtor held title to the real estate and improvements at four of its Florida locations. Before commencing the bankruptcy proceeding, Debtor explored several strategic options in an effort to maximize its enterprise value. It eventually determined that an asset sale would best serve to accomplish its goal. Thus, prior to entering bankruptcy, Debtor entertained offers from several parties seeking to purchase its assets.

Debtor ultimately executed an Asset Purchase Agreement with Piccadilly Acquisition Corporation, an affiliate of TruFoods Corporation, on October 28, 2003. The agreement contemplated a purchase price of $54 million for substantially all of Debtor's assets. Piccadilly filed for relief under the Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.*, the following day, October 29, 2003. Upon commencement of the bankruptcy proceeding, Debtor simultaneously filed a motion seeking leave to sell substantially all of its assets outside the ordinary course of business under 11 U.S.C. § 363(b)(1), free and clear of all liens, claims, encumbrances and interests.[4] (*See* B.P.D.E. 21).[5]

The motion explicitly requested relief from taxes under 11 U.S.C. § 1146(c), stating

> The Debtor intends to use the proceeds of the Sale as the basis for its plan under a liquidating Chapter 11 process. Therefore the proposed sale of the Assets is "under a plan" within the meaning of Section 1146(c) of the Bankruptcy Code. Consummation of the Sale to Purchaser is necessary to the consummation of any plan. The consideration to be paid upon consummation of the Sale will be required to fund distributions in respect of the debts and liabilities owed by the Debtor. Given these circumstances, the sale of the Acquired Assets is one made "under a plan" pursuant to section 1146(c) of the Bankruptcy Code, and therefore should be exempt from the imposition of any stamp or similar tax.

---

3. The provision had previously been codified as 11 U.S.C. § 1146(c). It has since been redesignated as 11 U.S.C. § 1146(a) pursuant to the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005. The substance of the provision has not changed.

4. Pursuant to 11 U.S.C. § 363(b)(1), after notice and hearing, a debtor "may use, sell, or

lease, other than in the ordinary course of business, property of the estate."

5. On October 30, 2003, Debtor filed an amended motion seeking approval of the asset sale. (*See* B.P.D.E. 22). The amended motion was substantially the same as the original motion.

*See, In re Permar Provisions, Inc.*, 79 B.R. 530 (Bankr.E.D.N.Y.1987). (*Id.* at ¶ 32).

Although Debtor had already executed an asset purchase agreement with Piccadilly Acquisition Corporation, it nonetheless sought leave of the Bankruptcy Court to conduct an auction [6] through which the highest bidder would be entitled to purchase its assets.[7] The bidding process was approved in a Bankruptcy Court Order dated December 4, 2003.[8] (*See* B.P.D.E. 174). The order scheduled an auction of Debtor's assets, established bid and sale procedures for the auction and scheduled a hearing to approve the ultimate sale. The winning bidder, Piccadilly Investments, LLC, paid $80 million for Debtor's assets, an amount significantly higher than Piccadilly Acquisition Corporation's (pre-bankruptcy) $54 million bid.

A sale hearing was conducted, and an order approving the sale of substantially all of Debtor's assets to Piccadilly Investments, LLC was entered by the Bankruptcy Court on February 13, 2004.[9] In response to FDOR's objection to the provision in the motion that exempted the transaction from taxes, the Bankruptcy Court stated that "the problem raised by counsel [for FDOR] is [Piccadilly's] problem. If I approve the sale [Piccadilly will] deal with that problem from the amount of money from the sale." Thus, the Bankruptcy Judge ultimately overruled the objection by approving the sale but explicitly stated that the order would not prejudice FDOR's claim. (*February 13, 2004 Hearing* at 38–39). The transaction asset sale closed on March 16, 2004. Among the assets sold were four parcels of land, and the sale was memorialized through the transfer of special warranty deeds from Piccadilly Cafeterias, Inc. to Piccadilly Restaurants, LLC. (*See Second Am. Comp.*, Ex. A).[10] FDOR claims that the transfer of the real estate and deed entitles it to collect taxes.[11]

From their inception, the bankruptcy proceedings had been quite contentious, as the various interested parties each vied for a portion of Debtor's assets. In order to resolve the multitude of disputes between the interested parties, Debtor, the Ad Hoc Committee of Senior Secured Noteholders and the Official Committee of Unsecured

---

6. As the initial bidder, Piccadilly Acquisition Corporation served as a so-called "stalking horse" whose initial research, due diligence, and subsequent bid may encourage later bidders. *See In re 310 Associates*, 346 F.3d 31, 34 (2d Cir.2003). For its role, Piccadilly Acquisition Corporation was entitled to receive a breakup fee.

7. On November 7, 2003, Debtor filed a Motion for Entry of Order (A) Approving Competitive Bidding and Sale Procedures; (B) Approving Form of Asset Purchase Agreement; (C) Approving Form and Manner of Notices; (D) Scheduling Hearing Dates to Conduct Auction and to Consider Final Approval of Sale Including Treatment of Executory Contracts and Unexpired Leases; and (E) Granting Related Relief. (B.P.D.E. 67). The motion was subsequently amended.

8. An amended order was entered on December 11, 2003.

9. An amended sale order was entered on March 15, 2004. The amended order altered the manner in which secured noteholders could accept payment. The amended order was entered over the objection of FDOR.

10. The four special warranty deeds are all dated March 16, 2004. The parcels were purchased for the sums of: (1) $1,825,000; (2) $1,500,000; (3) $815,000: and (4) $1,460,000.

11. FDOR does not identify the provision of the tax code pursuant to which it claims to be entitled to collect taxes. However, Debtor does not dispute that in the absence of the section 1146 tax exemption, FDOR would be entitled to the disputed taxes.

Creditors, entered into a global settlement agreement. The settlement agreement resolved, among other things, the priority of distribution among Debtor's creditors and in many ways was analogous to a confirmation plan. The Bankruptcy Court approved the settlement agreement in an order dated February 25, 2004. (B.P.D.E. 374).

Shortly following the closing of the Debtor's asset sale and the approval of the settlement agreement, Debtor filed its initial confirmation plan and disclosure statement on March 26, 2004. (B.P.D.E. 469, 470).[12] An Amended Joint Chapter 11 Plan of Liquidation and disclosure statement were filed on July 31, 2004. The Bankruptcy Court confirmed the Amended Plan of Reorganization on October 21, 2004. (B.P.D.E. 1044).

### FDOR's Actions

Throughout the bankruptcy proceedings, FDOR maintained that it was entitled to collect taxes and took multiple actions to protect its interests. FDOR initially argued that the bidding procedures did not protect its interests and sought reconsideration of the bidding procedures order (B.P.D.E. 221),[13] a request that the Bankruptcy Court denied. FDOR also objected to Debtor's request for a tax exemption under section 1146 in its motion seeking leave to sell substantially all of its assets. (See B.P.D.E. 186). Notwithstanding FDOR's objections, following a hearing, the Bankruptcy Court approved the sale of Debtor's assets in an order dated February 13, 2004. (See B.P.D.E. 347). The order stated that "[t]he sale of the Acquired Assets are [sic] in contemplation of a plan and, accordingly, the transfer of the Acquired Assets to the Purchaser are [sic] exempt, under section 1146(c) of the Bankruptcy Code, from any transfer, stamp or similar tax." (See Id. at p. 18).[14]

After the Bankruptcy Court amended the sale order, FDOR filed a Motion for Reconsideration of Hearing and or Motion to Vacate Order Granting Emergency Motion of Debtor to Amend Sale Order, Vacating the Portion of the Amended Order and the Sale Order Granting the Debtor an 1146(c) Tax Exemption Prior to a Confirmed Plan. The motion was rejected in an order dated May 24, 2004. (B.P.D.E. 646). FDOR initially sought to appeal the May 24, 2004 order (see B.P.D.E. 660), but voluntarily dismissed the appeal. (See August 24, 2004 Order of Dismissal).

FDOR then attempted another route to challenge the tax exemption, filing an objection to the Amended Joint Chapter 11 Plan of Liquidation on September 2, 2004.[15] (B.P.D.E. 944). The Bankruptcy Court approved the confirmation plan over FDOR's objections in an order dated October 21, 2004. FDOR subsequently sought reconsideration of the order confirming the plan of reorganization in a motion dated October 28, 2004 (B.P.D.E. 1075), a request that was denied.

FDOR commenced the adversary proceeding giving rise to this appeal by complaint[16] filed on October 20, 2004. FDOR filed a Second Amended Complaint in the adversary proceeding on November 23,

---

**12.** The initial plan and disclosure statement are not part of the record on appeal.

**13.** FDOR argued that it had not received notice of the hearing on the motion.

**14.** As noted, however, the order did not prejudice FDOR's ability to further pursue its interests.

**15.** FDOR filed an amended objection on October 21, 2004. (B.P.D.E. 1040).

**16.** In its original complaint, FDOR sought $2 million. The amount sought was reduced to $39,200 in its second amended complaint.

2004.[17] FDOR seeks[18] approximately $39,200 in stamp taxes from Debtor. Debtor and FDOR filed cross-motions for summary judgment in the adversary proceeding.

The Bankruptcy Court held oral argument on the summary judgment motions, at which time Debtor argued that "[t]here would be no plan in this case had there not been the sale of this property, had there not been the global settlement agreement that set up the sale of the property and that set up the framework of the plan." (*Transcript* at 11). At oral argument, FDOR conceded that "the actual sale itself contemplated the liquidating plan." (*Id.* at 14). The Bankruptcy Judge emphasized the uniqueness of the facts of the case.

In granting Debtor's motion for summary judgment, and denying FDOR's motion, the Bankruptcy Court held that "[t]he transfer of substantially all of the assets of the Debtor, including the Florida properties, were transfers 'under' the Plan because such transfer was necessary to consummate the Plan. The sale of substantially all of the assets of the Debtor contemplated the liquidating plan, which sale and plan were so interwoven that one could not proceed without the other." (*Summary Judgment Order* ¶ 24). Moreover, "[s]uch transfer was necessary to the consummation of the confirmed Plan because the sale of Debtor's assets generated the proceeds required to fund the Plan."

(*Id.* at ¶ 25). FDOR appeals the Bankruptcy Court's order.

## II. *ANALYSIS*

■ The parties' dispute concerns the proper interpretation, and reach, of 11 U.S.C. § 1146(a).[19] The provision states that "[t]he issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer under a plan confirmed under section 1129 of this title, may not be taxed under any law imposing a stamp tax or similar tax." 11 U.S.C. § 1146(a). The Eleventh Circuit has held that the following three conditions must be satisfied before a party may qualify for an exemption under section 1146(a): (1) there must be a stamp tax or similar tax, (2) imposed upon the making or delivery of an instrument of transfer, (3) "under" a confirmed Chapter 11 plan. *In re T.H. Orlando Ltd.*, 391 F.3d 1287, 1291 (11th Cir.2004)(citing *In re Amsterdam Ave. Dev. Associates*, 103 B.R. 454, 456 (Bankr. S.D.N.Y.1989)). The parties concede that the first two conditions have been satisfied here. Thus, the dispute turns entirely upon whether pre-confirmation transfers constitute transfers "under" a confirmation plan.

### A. Overview of Case Law

Notwithstanding Debtor's argument to the contrary, the issue is still very much unsettled among courts. Debtor argues

17. FDOR similarly filed a proof of claim for $2 million which it voluntarily reduced to $39,200. Debtor objected to the claim. The claim objection was ultimately consolidated with the adversary proceeding.

18. The precise relief requested by FDOR is unclear. The Second Amended Complaint initially seeks a declaratory judgment. (*Second Amended Complaint* [A.P.D.E. 6]). However, the pleading subsequently "demands Judgment against Defendant for approximate-ly $39,200.00, due and owing to Plaintiff for documentary stamp taxes, not including an amount due and owing for mortgage recording taxes ... and further relief as this Court deems just and proper." (*Id.*).

19. District courts have appellate jurisdiction over the judgments, orders, and decrees of bankruptcy courts. 28 U.S.C. § 158(a). On appeal, a district court reviews a bankruptcy court's conclusions of law *de novo*. *In re Calvert*, 907 F.2d 1069, 1071 (11th Cir.1990).

that "there are only two circuits, the Third and Fourth, that have ruled on the issue as urged by the DOR. Nearly every other court supports the position of the Appellee." (*Debtor's Brief* at 8). Debtor neglects to mention that the Third and Fourth Circuits *are the only circuit courts to squarely address the issue.*

In *In re NVR, LP,* 189 F.3d 442 (4th Cir.1999), the Fourth Circuit held that the plain language of section 1146 foreclosed application of the tax exemption to preconfirmation property transfers. The court stated:

> The question is whether the word "under," as used in § 1146(c), could extend the statute's effect to preconfirmation transfers. To ascertain the ordinary understanding of "under," we turn to the dictionary. *See MCI Telecomm. Co.[Corp.] v. AT & T Corp.[Co.],* 512 U.S. 218, 228, 114 S.Ct. 2223, 129 L.Ed.2d 182 (1994) (discussing the use of dictionary definitions to interpret statutory text). Black's Law Dictionary defines "under" as " 'inferior' or 'subordinate.' " *Black's Law Dictionary* 1525 (6th ed.1990). Another standard dictionary defines "under" as "[w]ith the authorization of." *See Webster's II New Riverside University Dictionary* 1256 (1988). Logically reading these definitions in the context of § 1146[a], we cannot say that a transfer made prior to the date of plan confirmation could be subordinate to, or authorized by, something that did not exist at the date of transfer-a plan confirmed by the court.

*Id.* at 457. Finding that the "plain language" was incapable of supporting an interpretation that made section 1146(a) applicable to pre-confirmation transfers, the Fourth Circuit did not engage in any further inquiry.

The Third Circuit recently reached an identical conclusion to that reached by the Fourth Circuit (section 1146 does not apply to pre-confirmation property transfers) although it did not adopt the Fourth Circuit's reasoning. *See In re Hechinger Inv. Co. of Delaware, Inc.,* 335 F.3d 243 (3d Cir.2003)(Alito, J.). In *Hechinger,* the Third Circuit rejected the suggestion that the term "under" could only have one meaning in the context of section 1146, although it found "that 'authorized by' is the most natural reading of the term 'under.' " *Id.* at 252–53. It supported its conclusion that "under" is properly interpreted as "authorized by," and that 1146 is therefore inapplicable to pre-confirmation transfers, on the following bases: (1) the reading is in greatest harmony with the additional language of section 1146, *id.* at 253; (2) the reading "gives the phrase 'under a plan confirmed' the same meaning as an identical phrase in another provision of the Bankruptcy Code, 11 U.S.C. § 365(g)," *id.* at 254; (3) the reading is consistent with the maxim of statutory construction that tax exemption provisions are to be strictly construed, *id.;* and (4) the reading is consistent with the Supreme Court's instruction that "federal laws that interfere with a state's taxation scheme must be narrowly construed in favor of the state." *Id.* (citations omitted).

The circuit court decision relied upon by Debtor, and cited by district courts that have granted exemptions to pre-confirmation transfers, is the Second Circuit's decision in *In re Jacoby–Bender, Inc.,* 758 F.2d 840 (2d Cir.1985). In *Jacoby–Bender,* the precise question presented to the Second Circuit was whether a property transfer that occurred post-confirmation was exempt under section 1146, notwithstanding that the confirmation "plan did not mention any instrument of transfer and did not give the debtor the authority

to make the specific sale." *Id.* at 841.[20] Thus, the *Jacoby–Bender* court did not specifically address the question presented here; namely, whether a transfer must have taken place post-confirmation in order to qualify for the tax exemption under section 1146. *See In re 310 Associates, L.P.,* 282 B.R. 295, 300 (S.D.N.Y. 2002)("The Second Circuit did not address any timing issue in *Jacoby–Bender. Jacoby–Bender* involved a post-confirmation transfer, not a transfer occurring before the drafting of any plan."). Although the court's holding is distinguishable, the language underlying the holding is relevant to the parties' dispute.

The *Jacoby–Bender* court noted that "Congress's apparent purpose in enacting section 1146 was to facilitate reorganizations through giving tax relief." *Id.* at 841. Therefore, the court held that whether a plan specifically addressed a particular transfer was irrelevant. *Id.* Finally, and most importantly to the instant issue, the Second Circuit held that "where, as here, a transfer, and hence an instrument of transfer, is necessary to the consummation of a plan, the plan seems implicitly to have 'dealt with' the transfer instrument." *Id.* at 842. It is the latter reasoning upon which subsequent courts have focused in rejecting the argument that section 1146 does not apply to pre-confirmation transfers. *See, e.g., In re Webster Classic Auctions, Inc.,* 318 B.R. 216 (Bankr.M.D.Fla. 2004); *In re Beulah Church of God In Christ Jesus, Inc.,* 316 B.R. 41 (Bankr. S.D.N.Y.2004); *In re GST Telecom, Inc.,* No. 00–1982–GMS, 2002 WL 442233 (D.Del. March 20, 2002); *In re Linc Capital, Inc.,* 280 B.R. 640 (Bankr.N.D.Ill. 2002); *In re Lopez Development, Inc.,* 154 B.R. 607, 609 n. 3 (Bankr.S.D.Fla.1993);

*In re Permar Provisions, Inc.,* 79 B.R. 530 (Bankr.E.D.N.Y.1987); *In re Smoss Enterprises Corp.,* 54 B.R. 950 (E.D.N.Y. 1985).

Of course, while the pronouncements of other circuits may be persuasive, the Court is only bound by the dictates of the Eleventh Circuit, which has never squarely addressed the issue in a reported decision. Debtor and the Bankruptcy Court's decision rely upon the Eleventh Circuit's recent decision in *In re T.H. Orlando Ltd.,* 391 F.3d 1287 (11th Cir.2004), to support the position that section 1146 is applicable to pre-confirmation property transfers. As both parties acknowledge, *T.H. Orlando* was before the Eleventh Circuit under a different factual predicate than the one presented here. In *T.H. Orlando,* as part of a confirmation plan, a third-party mortgage lender agreed to lend money to the debtor on the condition that a non-debtor who owned property adjacent to the debtor's property would refinance its mortgage through the same mortgage lender. The question before the Eleventh Circuit was whether taxes arising from a transaction between two non-debtors, a transaction that was specifically contemplated by the confirmed plan of reorganization, was entitled to an exemption under section 1146.

The *T.H. Orlando* court explicitly agreed with the holdings in all three of the aforementioned circuit court opinions. It noted that "[a] transfer 'under a plan' refers to a transfer authorized by a confirmed Chapter 11 plan. In turn, a plan authorizes any transfer that is necessary to the consummation of the plan." *Id.* at 1291. The court "conclude[d] that the phrase 'under a plan' refers to a transfer

---

**20.** Subsequent decisions have questioned whether the transfer was indeed a post-confirmation transfer. However, the undersigned finds resolution of the question to be irrele-vant as, in the opinion, the Second Circuit clearly believed that it was addressing the applicability of section 1146 to a post-confirmation transfer.

that is necessary to the consummation of a confirmed Chapter 11 plan irrespective of whether the transfer involved the debtor or property of the estate." *Id.* at 1292.

Both parties urge contrasting interpretations of the holding of *T.H. Orlando* that do not find support in the language of the opinion. Although FDOR correctly notes that the Eleventh Circuit approvingly cited the Third and Fourth Circuit opinions in *Hechinger* and *NVR,* respectively, it neither implicitly nor explicitly approved of the holding that section 1146(a) is inapplicable to pre-confirmation transfers. Likewise, the court's conclusion that " 'under a plan' refers to a transfer that is necessary to the consummation of a confirmed Chapter 11 plan," *id.* at 1292, does not necessarily support the statutory interpretation urged by Debtor. Indeed, *T.H. Orlando* speaks to transactions "necessary to the *consummation* of a confirmed Chapter 11 plan." *Id.* Debtor would have this Court read "necessary to the *consummation* of a confirmed Chapter 11 plan" as "necessary to *confirmation* of a proposed (or contemplated) confirmation plan." While Debtor's interpretation is reasonable, it is certainly not required.

It is worth noting that the only two Florida bankruptcy cases identified by the Court that have addressed the question both held section 1146(a) to be applicable to pre-confirmation property transfers. In *In re Lopez Development, Inc.,* the court stated that "the fact that the transfers of the Properties occurred prior to confirmation is, for purposes of 11 U.S.C. § 1146(c), of no consequence . . . . the purpose of this section is to facilitate reorganizations by granting tax relief. The Court will not construe this section to limit its applicability to transfers occurring after a plan is confirmed. To do so would not facilitate reorganizations." 154 B.R. 607 at 609 n. 3.

Likewise, in *In re Webster Classic Auctions, Inc.,* 318 B.R. at 216, the bankruptcy court thoughtfully analyzed the issue as follows:

A striking similarity between the Third and Fourth Circuit opinions is both opinions reversed bankruptcy court findings that § 1146[a] applied to the transfers at issue in their cases, perhaps implying the sometimes academic exercise of statutory interpretation may be overshadowing the practical realities of bankruptcy reorganization. This Court finds § 1146[a] does not contain a per se temporal requirement, but rather requires appropriate notice and opportunity for parties to understand there is a debtor in bankruptcy and the transfer in question involves the debtor's property and a taxable event. As Chapter 11 reorganization is a sophisticated process, this Court finds inserting an artificial preconfirmation v. postconfirmation line of demarcation into the § 1146[a] analysis fails to recognize the complexities the reorganizing debtor often faces. For these reasons, this Court will not follow the restrictive interpretation adopted by the Third and Fourth Circuit Courts of Appeal.

*Id.* at 219. The court proceeded to outline a framework requiring that the following criteria be satisfied before a pre-confirmation property transfer may be exempt from taxes pursuant to section 1146(a): (1) there must be a plan that contemplates the sale of property; (2) the plan must be ultimately confirmed; (3) any sale of property contemplated in the plan which is sought to be sold prior to confirmation must set out the requirements of § 1146(a), and must be served on all relevant taxing authorities; and (4) notice to the authorities must be included in the section 363 sale motion. *Id.*

Having benefitted from the well-reasoned opinions of other courts, the Court now turns to its own analysis.

## B. Statutory Construction

Courts that have refused to impose strict temporal requirements have stressed that "Congress's apparent purpose in enacting section 1146 was to facilitate reorganizations through giving tax relief." *Jacoby–Bender*, 758 F.2d at 841. Indeed, it appears beyond dispute that "[t]here are times when it is more advantageous for the debtor to begin to sell as many assets as quickly as possible in order to insure that the assets do not lose value." *GST Telecom*, 2002 WL 442233, at *2. Thus, there are times when "it is actually more likely (and, sometimes, more wise) for debtors to sell assets prior to confirmation." *Id. See also In re Beulah Church of God In Christ Jesus, Inc.*, 316 B.R. at 50 ("it is just as likely that a debtor may need to arrange a financing or to close a sale as a condition precedent to the parties' willingness to proceed with plan confirmation as it is for the parties to agree on the terms of a plan, obtain confirmation and then see what the sale of a key asset or a proposed financing will bring"). Given Congress' purported intent in enacting 11 U.S.C. § 1146, and the possibility that such intent would be undermined if courts were to impose a bright-line temporal requirement, many courts have adopted a functional, rather than bright line, test to determine if a property transfer is "under" a confirmation plan.

■ However, lest we get ahead of ourselves, it is a well-known maxim of statutory construction that a court must begin "with the language of the statute itself." *In re T.H. Orlando Ltd.*, 391 F.3d at 1291 (quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 240, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989)). Thus, any discussion of furthering Congress' intentions is premature, as the language of the statute controls. Indeed, "it is not for [the Court] to substitute its view of . . . policy for the legislation which has been passed by Congress." *In re Hechinger*, 335 F.3d at 256 (citation omitted).

Here, however, a "plain meaning" analysis does not yield any clear answer to the question of whether the term "under" contains an implicit or explicit temporal limitation. Indeed, as noted by the Third Circuit "[t]he preposition 'under' is . . . very common, and it can have many different meanings in different contexts." *Id.* at 252. The ubiquitous nature of the term "under" is evidenced by the *Hechinger* court's identification of one dictionary listing 13 definitions of the term and another dictionary listing *27 definitions. See Id.* (citations omitted). As Judge Wilkinson insightfully noted in his concurring opinion in *In re NVR*, "[i]f Congress used the words 'under a plan ultimately confirmed,' that would have made the matter clear. Or if Congress used the words 'under a confirmed plan,' that would have made its intentions obvious. Congress used neither phrasing-hence the ambiguity." 189 F.3d at 458 n. 1.

Having failed to resolve the issue by reference to the "plain meaning" of the statutory language, the undersigned turns to other tools of statutory interpretation for help. Unfortunately, other textual approaches to the problem also fail to support a clear result. *Hechinger* concluded that a contextual reading of the term "under" supported a holding that section 1146 is inapplicable to pre-confirmation property transfers. Respectfully, the undersigned does not agree.

*Hechinger* noted that "[i]t is a normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same mean-

ing." *In re Hechinger*, 335 F.3d at 253. After analyzing the Bankruptcy Code's other uses of the term "under" and "under a plan confirmed," focusing particularly on the uses of the term "under" in section 1146, it concluded that "under" meant "authorized by." *See id.* at 253–54. Because "authorized by" implicitly contains a temporal limitation, the court held section 1146 inapplicable to pre-confirmation transfers.

As the dissent in *Hechinger* emphasized, the term "under" is used nearly two hundred times throughout the Bankruptcy Code. *Id.* at 258. Thus, settling upon one universal definition of the term, a term that has multiple accepted definitions, which is universally applicable throughout the Bankruptcy Code, is impossible. Moreover, Judge Nygaard (in dissent) aptly recognized that the Third Circuit's interpretation runs afoul of several other maxims of statutory construction, including the following: (1) Congress used the term "authorized under" in several other sections of the code and thus would presumably have used the term in section 1146 if it so desired; (2) 11 U.S.C. § 1129 clearly contemplates that certain payments may be made "under a plan" although the plan has not been confirmed, thereby undermining the conclusion that "under a plan confirmed" requires that the plan be confirmed prior to the transaction; and (3) Congress applied temporal restrictions in several other sections of the Bankruptcy Code and would have done so in section 1146 if it had so desired. *See id.* at 257–59. The undersigned does not suggest that Judge Nygaard's dissenting opinion is more persuasive than the majority opinion but merely addresses his arguments as evidence that a contextual reading of section 1146 is no more conclusive than is a "plain meaning" interpretation. Indeed, the difficulty in reaching a result through the text of the Bankruptcy Code is evi-denced by the failure of both the Third and Fourth Circuit panels to reach a unanimous holding.

FDOR also argues that the rules pertaining to construction of tax statutes favor its position. It is well-established "that tax-exemption and-deferral provisions are to be construed narrowly." *U.S. v. Centennial Sav. Bank FSB*, 499 U.S. 573, 583, 111 S.Ct. 1512, 113 L.Ed.2d 608 (1991)(citing *Commissioner v. Jacobson*, 336 U.S. 28, 49, 69 S.Ct. 358, 93 L.Ed. 477 (1949); *Elam v. Commissioner*, 477 F.2d 1333, 1335 (6th Cir.1973)). Likewise, there is a "strong background presumption against interference with state taxation." *National Private Truck Council, Inc. v. Oklahoma Tax Com'n*, 515 U.S. 582, 590, 115 S.Ct. 2351, 132 L.Ed.2d 509 (1995). The parties do not contest that section 1146 is a provision that, by design, both provides a tax exemption and interferes with state taxation.

"[T]he danger in choosing an interpretive canon is that it may, like an importunate acquaintance, unduly monopolize one's attention." *In re Beulah Church of God In Christ Jesus, Inc.*, 316 B.R. at 50. In *In re T.H. Orlando*, the Eleventh Circuit considered the argument raised by FDOR here; namely, that the need to narrowly construe tax exemption statutes counseled against a holding that transactions between non-debtors are exempt under the statute. The court roundly rejected the argument, noting that "[n]othing in the plain language of § 1146(c) restricts the exemption to transactions involving the debtor and estate property." 391 F.3d at 1295. Admittedly, and as stated, *In re T.H. Orlando* is not on all fours with this case. However, its reasoning is both relevant and persuasive. In the absence of language to the contrary, the Eleventh Circuit held that where Congress intends

to exempt certain transactions, it will not construct exceptions to the exemptions that do not appear in the relevant language of the provision. Similarly, in the absence of any language imposing a temporal requirement, the undersigned does not believe it to be the duty, or prerogative, of the Court to impose one.

After finding the above rules of statutory construction to be unhelpful, the Court returns to its duty to interpret statutes consistent with the intentions of Congress. The undersigned fully adopts the Second Circuit's observation that "Congress's apparent purpose in enacting section 1146 was to facilitate reorganizations through giving tax relief." *Jacoby–Bender,* 758 F.2d at 841; *see also In re NVR,* 189 F.3d at 459 ("reading the phrase to require only that the plan ultimately be confirmed would comport with a central purpose of our bankruptcy laws: 'permitting business debtors to reorganize and restructure their debts in order to revive the debtors' businesses and thereby preserve jobs and protect investors' ")(Wilkinson, J. concurring)(quoting *Toibb v. Radloff,* 501 U.S. 157, 163, 111 S.Ct. 2197, 115 L.Ed.2d 145 (1991)) (citation omitted). Given Congress's purpose in granting the exemption, it is "difficult to believe that Congress intended such a limited application of the exemption, particularly given the absence of a rational basis for preferring some plan scenarios over others." *In re Hechinger Inv. Co. of Delaware, Inc.,* 254 B.R. 306, 320 (Bankr.D.Del.2000).[21]

Indeed, the instant case presents a perfect example of the perils of imposing an arbitrary temporal requirement. As noted, Debtor initially received a $54 million offer for its assets; only a few months later, Debtor sold its assets for $80 million.

Neither party disputes that the vagaries of the market often dictate that time is of the essence and that waiting for a plan to be confirmed before making a sale will often be detrimental, or even fatal, to the ultimate confirmation of the plan. The undersigned declines to adopt an interpretation that will effectively remove most transactions in furtherance of confirmation plans from the reach of the exemption.

## C. Reach of Holding

The undersigned emphasizes that in this appeal, she has been presented with the limited question of "[w]hether 11 U.S.C. § 1146(c) ... applies where a transfer is made pre-confirmation." Thus, this Order only addresses whether section 1146's tax exemption *may be* applied, as a general proposition, to pre-confirmation transfers. Whether the Bankruptcy Court appropriately applied the exemption to the specific pre-confirmation property transfers at issue has not been addressed by the parties and the Court will not decide an issue not properly before it.

■ Accordingly, the Court need not answer whether a confirmation plan need be filed with the bankruptcy court and/or contemplated by the parties in order for the 1146(a) exemption to apply. The Court cautions, however, that not all pre-confirmation asset sales will be entitled to the section 1146 exemption. Indeed, 11 U.S.C. § 363 permits a debtor (or trustee) to sell a substantial portion of its assets with court approval. Had Congress intended to exempt all such transfers from taxation, it could have easily done so. Thus, sale of assets under section 363 and the consummation of a confirmation plan are not enough to entitle a party to the

---

**21.** Congressional intent is gleaned solely from the content of section 1146 as "the legislative history of section 1146(c) is, at best, scant, indirect and uninformative." *In re Beulah Church of God In Christ Jesus,* 316 B.R. at 49 (citations omitted).

1146 exemption. There must be some nexus between the pre-confirmation sale and the confirmation plan. As stated, however, the extent of that nexus, and the relevant procedural considerations, need not be outlined at present.

### III. *CONCLUSION*

■ As Isaac Newton aptly observed, "[i]f I have seen further it is by standing on the shoulders of giants." The Court has been presented with a very difficult question with sound arguments supporting each party's position. Luckily, the undersigned has had the benefit of other courts' well—reasoned analyses in ultimately concluding that section 1146(a) may apply to pre-confirmation property transfers. For the reasons stated above, it is

**ORDERED AND ADJUDGED** that the Bankruptcy Court's Final Summary Judgment Against Plaintiff, State of Florida, Department of Revenue is **AFFIRMED.** The Clerk of the Court is instructed to **CLOSE** the case and all pending motions are **DENIED AS MOOT.**

**DONE AND ORDERED.**